[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 7, 2003
THOMAS K. KAHN
CLERK

No. 98-6292

D.C. Docket No. 94-02639-CV-N-W

JAMES BARNEY HUBBARD,

Petitioner-Appellant,

versus

MICHAEL HALEY, Commissioner,
Alabama Department of Corrections

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Alabama

(January 7, 2003)

Before TJOFLAT, DUBINA and BARKETT, Circuit Judges.

TJOFLAT, Circuit Judge:

Petitioner, an inmate on Alabama's death row, appeals the denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After denying relief, the district court granted petitioner a certificate of appealability on five claims as to which petitioner had made a substantial showing of the denial of a constitutional right.[1] We conclude that none of these claims merits issuance of the writ. We therefore affirm.

## I.

## A.

Petitioner, James Barney Hubbard ("Hubbard"), is awaiting execution by the state of Alabama for the January 10, 1977 murder of Lillian Montgomery ("Montgomery"). The murder took place in Montgomery's home, adjacent to a store she owned and operated in Tuscaloosa, around 6 o'clock in the morning. Hubbard had moved in with Montgomery (on an undisclosed date) following his

---

[1] The district court initially granted petitioner a certificate of probable cause ("CPC"), allowing him to pursue on appeal each of the claims presented to, and rejected by, the district court. We vacated the CPC and remanded the case with instructions that the court issue a certificate of appealability ("COA") for only those claims as to which the petitioner had made a substantial showing of the denial of a constitutional right, in accordance with the Supreme Court's decision in Slack v. McDaniel, 529 U.S. 473, 481, 120 S. Ct. 1595, 1602, 146 L. Ed. 2d 542 (2000). Slack instructs that petitions for habeas corpus relief filed before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), and subsequently appealed after AEDPA's enactment, are governed by AEDPA. The district court granted the COA on which we now proceed on December 10, 2001.

release from an Alabama prison after having served twenty years of a fifty-year sentence for a second-degree murder he committed in 1957, also in Tuscaloosa.[2] Montgomery died as a result of three gunshot wounds to the head, face and shoulder.

An hour or two after the murder, Hubbard placed an emergency telephone call to the Tuscaloosa police department; two officers and paramedics promptly arrived at the scene and discovered the body. The officers, Jack Manley and Charles Stephens, asked Hubbard what had happened, and he told them that Montgomery shot herself. After the officers discovered a gun and ammunition in one of Hubbard's pockets, Manley read Hubbard his <u>Miranda</u> rights and placed him in the back seat of the patrol car. Although the officers found a bottle of Cabin Hollow whiskey on Hubbard's person and smelled alcohol on his breath, Hubbard did not appear to be intoxicated. After Hubbard was placed in the patrol car, Coroner Earl Mitchell, state toxicologist James Britten, and homicide detective Dempsey Marcum arrived and searched the home. In an upstairs bedroom wastebasket, they found three spent bullet casings.

Shortly thereafter, Manley and Stephens transported Hubbard to the police

---

[2] The record does not indicate whether petitioner had been released on parole or, taking "good time" into account, had served out his sentence.

station.  There, Marcum advised Hubbard of his <u>Miranda</u> rights, and Hubbard signed a waiver of rights form indicating that he understood his rights and chose to answer Marcum's questions.  The interview lasted approximately thirty minutes. As Hubbard spoke, Marcum paraphrased what he said and wrote it down in the form of a statement (the "Marcum statement").  The Marcum statement reiterated Hubbard's earlier claim that Montgomery had committed suicide, but added that after she shot herself, she told Hubbard that she wanted him to have her car.[3]  The Marcum statement also indicated that after calling several friends and the police department to request an ambulance, Hubbard took the gun from under Montgomery's left hand, reloaded it, and was preparing to hide it when the police arrived.

After Marcum read what he had written to Hubbard, Hubbard examined it and began to sign it, but stopped in the course of doing so to ask for a drink "to steady his nerves."  Marcum gave Hubbard the bottle of whiskey the officers had removed from his possession before bringing him to the police station.  After taking a drink, Hubbard signed the Marcum statement.  Hubbard did not appear intoxicated at this time.

---

[3] The doctor who performed Montgomery's autopsy, Dr. Henry Santina, testified at Hubbard's trial that Montgomery would have been completely unable to speak because one of the bullets entered her mouth, shattering her jaw and lacerating her tongue.  Furthermore, Santina concluded that the bullet that entered her brain probably resulted in her immediate death.

4

After Hubbard signed the statement, Marcum had him taken to the county jail and booked. An inventory of his personal possessions uncovered a woman's gold and diamond watch, checks payable to cash or Montgomery totaling $230, and $273.22 in cash.[4] During the inventory, Hubbard spontaneously told Marcum that, after she shot herself, Montgomery told him that she wanted him to have her watch and valuables, in addition to the car.

B.

In February 1977, a Tuscaloosa County grand jury indicted Hubbard for the murder of Montgomery. The indictment, framed in two counts, charged Hubbard under the Alabama Death Penalty Act, Ala. Code § 13-11-2(a)(13) (1975), with both first degree and second degree murder, each alleging the statutory aggravating circumstance that he had been convicted of second degree murder during the twenty years preceding Montgomery's murder (i.e., the murder Hubbard committed in 1957).[5] On April 14, Hubbard's counsel petitioned the Tuscaloosa

---

[4] Subsequently, police officers were informed by Montgomery's son that the cash register of her store was empty.

[5] Section 13-11-2 (now recodified at § 13A-5-40) lists Capital Offenses. Included in this list is "Murder by the defendant who has been convicted of any other murder in the 20 years preceding the crime; provided that the murder which constitutes the capital crime shall be murder as defined in subsection (b)." Ala. Code § 13A5-40(a)(13) (2002). Subsection (b) limits the definition of "murder" to murder committed "with intent to cause the death of another person." Id. § 13A-5-40(b) (citing Ala. Code § 13A-6-2(a)(1) (2002)). The Alabama courts rejected constitutional challenges to this section, and held that "the indictment need not charge that the killing was done 'unlawfully and intentionally and with malice aforethought' . . . as the

County Circuit Court to have Hubbard examined to determine his competency to stand trial and whether he was insane at the time of the offense. The court ordered the examination. On June 10, the Lunacy Commission at Bryce Hospital reported that Hubbard was competent to stand trial and gave no indication of his having been insane at the time of the offense.

Hubbard went to trial before a jury in September 1977. The jury found him guilty of first degree murder, as charged in the indictment.[6] Under Alabama law, the court was required to impose the death sentence, and it did so. The court of criminal appeals affirmed Hubbard's conviction and sentence. See Hubbard v. State, 382 So. 2d 577 (Ala. Crim. App. 1979). The supreme court also affirmed. See Ex parte Hubbard, 382 So. 2d 597 (Ala. 1980). After the United States Supreme Court, in Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), declared Alabama's capital sentencing scheme unconstitutional,[7] the

---

statute only requires an 'intentional killing.' " See Hubbard v. State, 500 So.2d 1204, 1217 (Ala. Crim. App. 1986), aff'd, 500 So.2d 1231 (Ala. 1986). Thus, in Alabama in 1977 (and at the present time), second degree murder with the aggravating circumstance was a capital offense.

[6] In finding him guilty as charged in the indictment, the jury found that Hubbard had committed second degree murder within 20 years of the Montgomery homicide.

[7] Under Ala. Code § 13-11-2(a) (1975), the judge, in a capital case, was prohibited from instructing the jury on lesser-included offenses. See id. Moreover, if the jury found the defendant guilty of one of the capital offenses as listed in Ala. Code § 13-11-2(a)(1)-(14) (1975) (all of which include a statutory aggravating circumstance) the jury was required to impose the death sentence. Thus, the jury was faced with only two choices – acquittal or death. Addressing

Alabama Supreme Court, on rehearing, reversed Hubbard's conviction (and sentence) and remanded the case for a new trial. See Hubbard v. State, 405 So. 2d 695 (Ala. 1981).

Prior to Hubbard's second trial, which convened on April 19, 1982, the court appointed Douglas Hendrix and Charles Michael Stilson to represent him. As in the first trial, Hubbard's defense was that Montgomery had committed suicide.[8] The jury rejected the defense and, once again, found Hubbard guilty of first degree murder. At the conclusion of the penalty phase of the trial, the jury recommended that Hubbard be sentenced to death. After affording Hubbard a subsequent sentencing hearing, the judge followed the jury's recommendation and imposed the death sentence. In its order, the court specifically found three aggravating factors: (1) that Hubbard killed Montgomery for pecuniary gain; (2) that he had done so

---

the prohibition against instructing the jury on lesser-included offenses, the Supreme Court held that where there is "some doubt with respect to an element that would justify conviction of a capital offense," the judge must give the jury the "third option" of convicting of a lesser-included offense. Beck v. Alabama, 447 U.S. 625, 637, 100 S. Ct. 2382, 2389, 65 L. Ed. 2d 392 (1980).

On remand, the Alabama Supreme Court, in a move to save the state's capital offense scheme, eliminated the mandatory death sentence for defendants convicted of capital crimes and instituted a bifurcated trial – with separate guilt and penalty phases before a jury – for those crimes. See Beck v. State, 396 So. 2d 645, 660 (Ala. 1980). The court further instructed that the jury should be presented with evidence of aggravating and mitigating circumstances at the penalty phase as well as arguments from the state and defendant for and against the imposition of the death penalty in order to aid it in determining whether to recommend a death sentence or life imprisonment. Id. at 663. However, the trial judge in a capital case is the sentencing authority, and may therefore override the jury's sentence recommendation. See id. at 659; see also Ala. Code § 13A-5-47 (2002).

   [8] Hubbard presented this defense without taking the witness stand and testifying.

7

within 20 years of his 1957 second degree murder conviction; and (3) that he murdered Montgomery in a cruel, malicious, and heinous manner. The Alabama Court of Criminal Appeals affirmed Hubbard's conviction and sentence, Hubbard v. State, 500 So. 2d 1204 (Ala. Crim. App. 1986); the Alabama Supreme Court did likewise, Ex parte Hubbard, 500 So. 2d 1231 (Ala. 1986). The United States Supreme Court denied his petition for a writ of certiorari. Hubbard v. Alabama, 480 U.S. 940, 107 S. Ct. 1591, 94 L. Ed. 2d 780 (1987).

In September 1988, Hubbard sought to challenge his 1957 conviction for second degree murder, which was the statutory aggravating factor in Montgomery's murder, by filing a motion in the Tuscaloosa County Circuit Court for an out of time appeal from that conviction.[9] The motion alleged that he had appealed his conviction to the Alabama Court of Appeals,[10] but that he had dismissed the appeal because he was unable to pay for a trial transcript; his lawyer failed to inform him that under Griffin v. Illinois, 351 U.S. 12, 76 S. Ct. 585, 100 L. Ed. 891 (1956), he had the right as an indigent defendant to a free trial

_____

[9] Hubbard's 1957 conviction, as well as his 1982 conviction, occurred in the Tuscaloosa County Circuit Court. None of the judges who presided over his 1957 trial and his collateral attacks on his 1957 conviction participated in any of the proceedings involving or relating to Hubbard's prosecution for the Montgomery murder.

[10] The Alabama Court of Appeals served as Alabama's intermediary appellate court from 1911 until 1969, when the legislature abolished the Court of Appeals and created two courts of appeal: the Court of Criminal Appeals and the Court of Civil Appeals.

transcript.  The circuit court denied Hubbard's motion.  The court of criminal appeals dismissed his appeal of that ruling, Hubbard v. State, 546 So. 2d 402 (Ala. Crim. App. 1989), and the supreme court denied his petition for a writ of certiorari, see Ex parte Hubbard, 544 So. 2d 932 (Ala. 1989).

While this motion was pending, Hubbard was seeking post-conviction relief from his 1982 first degree murder conviction in the Tuscaloosa County Circuit Court, under Rule 20 of the Alabama Rules of Criminal Procedure.[11]  His motion reiterated several claims that he had made on direct appeal, and raised new claims of ineffective assistance of trial and appellate counsel.  The trial court refused to consider the claims Hubbard had presented on direct appeal, and, after an evidentiary hearing, denied on the merits his claims of ineffective assistance of counsel.  The court of criminal appeals affirmed.  See Hubbard v. State, 584 So. 2d 895 (Ala. Crim. App. 1991).  The Supreme Court denied certiorari.  See Hubbard v. Alabama, 502 U.S. 1041, 112 S. Ct. 896, 116 L. Ed. 2d 798 (1992).  In October 1994, Hubbard filed the petition for a writ of habeas corpus now before us.

Hubbard's petition set forth seventeen distinct claims for relief.  On February 3, 1998, the district court issued an order, accompanied by a 154-page memorandum of opinion, dismissing the petition; the court concluded that

---

[11]  Rule 20 has since been codified as Ala. R. Crim. P. 32.

9

Hubbard's claims were either meritless or procedurally barred. In this appeal, we are presented with the claims for relief cited in the certificate of appealability that the district court issued on December 10, 2001. The first two claims take issue with evidentiary rulings by the trial judge. The first is that the judge erred in admitting the Marcum statement into evidence because the statement was involuntary. The second is that the judge erred in allowing the fact of Hubbard's 1957 second degree murder conviction to come before the jury because the conviction was the product of ineffective assistance of trial and appellate counsel. Hubbard's final three claims are ones of ineffective assistance of counsel at the pre-trial, trial, and sentencing phases of his 1982 trial. We examine these claims in turn.

## II.

Hubbard contends that the trial court erred in denying his motion to suppress the Marcum statement and admitting the statement into evidence in the State's case in chief.[12] According to Hubbard, Marcum took the statement in violation of his

---

[12] Hubbard moved to suppress the Marcum statement on two occasions: prior to his 1977 trial and prior to the 1982 trial now under review. On the first occasion, the trial court held an evidentiary hearing, found the statement to be voluntary, and denied Hubbard's motion. On direct appeal, Hubbard did not challenge this decision. See Hubbard v. State, 382 So. 2d 577 (Ala. Crim. App. 1979). On the second occasion, the one at issue here, the trial court, without considering whether the law-of-the-case doctrine rendered a new evidentiary hearing (concerning the statement) unnecessary, held another evidentiary hearing, during which it heard the testimony of Marcum and Stephens. At the conclusion of the hearing, the court took the

10

Fifth, Eighth and Fourteenth Amendment rights.[13]  The statement was not voluntary, he claims, due to his "biologically coercive state" – the combined effect of his alcoholism and low I.Q.  He contends that he had been drinking the morning of the murder, and that he was suffering from alcohol withdrawal, or delirium tremens, when Marcum interviewed him at the police station.  Somewhat paradoxically, Hubbard also claims that his statement was involuntary because he was intoxicated at the time he made it.  He further claims that Marcum coerced him to sign the statement by first withholding, then later offering, alcohol in exchange for his signature.

The trial court failed to make findings of fact – on the record or in a written order – in denying Hubbard's motion to suppress; nonetheless, the court of criminal appeals, on direct appeal, reviewed the record and made numerous findings of fact.  See Hubbard, 500 So. 2d at 1217-20.  The court found that "there was no improper inducement [by police] that overbore [Hubbard's] free will and

matter under advisement.  The court deferred its decision until after the trial began.  During the State's case in chief, Marcum took the stand, and the court excused the jury to enable defense counsel to examine Marcum further regarding the circumstances surrounding the taking of the Marcum statement.  After counsel, and then the prosecutor, examined Marcum, and the court asked a few questions, the court found the statement voluntary and denied Hubbard's motion to suppress.

[13]  Although the Marcum statement did not amount to a confession that Hubbard killed Montgomery, the statement was damaging because the evidence at trial overwhelmingly established its falsity.

11

rational intellect at the time he made and signed the statement." Id. at 1220. In arriving at this finding, the court noted that there was "no substantial evidence to support [Hubbard's] contention that his statement was inadmissible due to 'intoxication and chronic abuse of alcohol.' " Id. at 1219. Hence, the appellate court concluded, "[n]o error was committed in admitting the statement into evidence." Id. at 1220.

The district court, in considering Hubbard's habeas petition, conducted an independent review of the record, and concluded that substantial support existed for the criminal court of appeals' findings of fact. The district court therefore afforded those findings the full presumption of correctness. See 28 U.S.C. § 2254(e); Sumner v. Mata, 449 U.S. 539, 547, 101 S. Ct. 764, 769, 66 L. Ed. 2d 722 (1981) (holding that the presumption of correctness applies to factual findings of trial and appellate courts equally).[14] We similarly find ample support in the record for those findings and therefore presume them to be correct. The question thus becomes whether, given such findings, we could hold that Hubbard's statement to Marcum was involuntary. The voluntariness of a confession is a question of law which we review de novo. See Beckwith v. United States, 425 U.S. 341, 347-48,

---

[14] Although the Court in Sumner was interpreting section 2254 as it existed pre-AEDPA, the holding hinged on the fact that no distinction was made between state trial and appellate courts in the pre-AEDPA version of 2254 – a fact which continues to be true of the current version of the statute.

96 S. Ct. 1612, 1617, 48 L. Ed. 2d 1 (1976).

Whether the Marcum statement was voluntarily given by Hubbard must be examined in light of the totality of the circumstances. See Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973). This totality of the circumstances test directs us ultimately to determine whether Hubbard's statement was the product of "an essentially free and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors we must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. See, e.g., Bustamonte, 412 U.S. at 226, 93 S. Ct. at 2047; United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir. 1996). However, "while we have enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." Gonzalez, 71 F.3d at 828 (citations omitted).

In his petition, Hubbard cites three factors that rendered his statement involuntary – his marginal intelligence, his consumption of alcohol the morning of the murder and chronic alcoholism, and Marcum's act of giving him a drink so he could sign his statement. Given the scope of the test announced in Bustamonte, the

13

presence of one of these factors will not necessarily lead us to conclude that Hubbard's statement should have been excluded as a coerced statement. We discuss each of the factors cited in Hubbard's petition, beginning with the most serious.

Hubbard contends that Marcum coerced him into making his written statement by offering to return his bottle of whiskey to him only after he agreed to sign the statement. The district court found that, although "Marcum violated professional standards for police officers by allowing [Hubbard] to drink alcohol before signing his statement," his misconduct did not amount to coercion. Based on the totality of the circumstances, we cannot say that this finding is clearly erroneous. First, we note that Hubbard does not claim that Marcum offered to provide him with alcohol in exchange for making the statement in the first place. Nor is there any evidence in the record that this may have occurred. Rather, Hubbard only contends that his signature was coerced. Even if we accept as true that the written statement did not bear a valid signature, the statement was still admissible. See Wong Sun v. United States, 371 U.S. 471, 491, 83 S. Ct. 407, 419, 9 L. Ed. 2d 441 (1963) ("The fact that the statement was unsigned, whatever bearing this may have upon its weight and credibility, does not render it inadmissible; [the defendant] understood and adopted its substance . . . .").

14

Furthermore, the evidence in the record shows that it was Hubbard who asked Marcum for the whiskey, and only after he had completed his statement and begun to sign what Marcum placed before him. We find no support for the proposition that Marcum offered the alcohol in exchange for the statement.

Although the statement would still have been inadmissible if, as Hubbard claims, his voluntariness was overborne by either his consumption of or alcohol withdrawal, the district court found no evidence in the record to support either claim. Multiple witnesses testified that while Hubbard did have an odor of alcohol about him, he did not appear to be intoxicated or suffering from delirium tremens at the time he spoke to Marcum at the police station. Acknowledging, albeit tacitly, that the record before the trial judge when he denied Hubbard's motion to suppress contained no evidence that he was in "a biologically coercive state," Hubbard relies on the affidavits of two doctors to support his claim.[15] Even taking this supplemental evidence into account, the district court still found that the

_____

[15] Hubbard presented the district court with the affidavits of Dr. James C. Beck and Dr. C. Robert Showalter to support his claim that his alcoholism affected the voluntariness of his statement. The district court noted that Hubbard had not presented these affidavits to the trial judge – prior to the judge's denial of his motion to suppress or in support of his motion for Rule 20 relief – and thus could not properly be considered without a showing of cause and prejudice. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12, 112 S. Ct. 1715, 1721, 118 L. Ed. 2d 318 (1992) (requiring either a showing of cause and prejudice or that a fundamental miscarriage of justice would result from the denial of an evidentiary hearing). Although the district court held that Hubbard had not made the necessary showings, it did take Beck's affidavit into account, "only for the sake of argument, inasmuch as all petitioner's claims fail, whether or not the affidavit is considered."

15

evidence was insufficient to find that Hubbard was either too drunk or too sick

from alcohol withdrawal voluntarily to make the statement. We cannot say that the

district court clearly erred. The evidence in the record clearly refutes Hubbard's

claim, and the affidavits of two physicians, made years after Hubbard made his

statement, are nothing but mere speculation and thus possess no probative value.

Finally, the district court rejected Hubbard's claim that his low I.Q.[16]

rendered his statement involuntary. The court relied on state hospital records[17]

which indicated that Hubbard was free of mental disease or defect and able "to

understand the charges against him and to cooperate and assist in the conduct of his

defense." As we have held previously, "coercive police activity is a necessary

predicate to a finding that the confession by a person with a low intelligence level

is involuntary." Singleton v. Thigpen, 847 F.2d 668, 671 (11th Cir. 1988) (citation

omitted). Having already rejected Hubbard's contention that police coerced him

into making the Marcum statement, we must now reject Hubbard's claim based on

mental capacity.

---

[16] Hubbard's records at Alabama's Bryce Hospital indicate a verbal I.Q. of 77 and a full scale I.Q. of 80 – both in the borderline mentally retarded range – and a performance I.Q. of 86, which is in the low average range.

[17] These records include records of Hubbard's intermittent treatment for alcoholism at Bryce Hospital between August 1957 and May 1977, as well as the Lunacy Commission report dated June 10, 1977, prepared in response to a court order.

16

In conclusion, the totality of the circumstances simply does not support the claim that the Marcum statement should have been suppressed. The district court therefore committed no error in rejecting Hubbard's challenge to the voluntariness of his statement.

### III.

We next turn to Hubbard's claim that the trial court erred in permitting the State to introduce his 1957 second degree murder conviction into evidence to establish an essential element of the crime with which he had been charged: murder by an individual who had been convicted of murder within the preceding twenty years.[18] The court erred, Hubbard contends, because that conviction was invalid, having been obtained in violation of his Sixth and Fourteenth Amendments right to effective assistance of counsel. He claims that his lawyer, James Marshall, whom he had retained, rendered ineffective assistance in two ways. First, in representing Hubbard in the trial court, Marshall labored under an impermissible conflict of interest because, at the time, Marshall was also representing his co-indictee, Divid Hubbard ("Divid"), who was subsequently acquitted in a separate trial.[19] Second,

---

[18] The fact of the 1957 murder conviction permitted the grand jury, in indicting Hubbard for the 1977 Montgomery homicide, to charge him with capital murder ("murder by a convicted murderer") as opposed to ordinary, non-capital murder.

[19] Shortly after the jury found Hubbard guilty of second degree murder, he told the prosecutors that he had committed the murder pursuant to a conspiracy with Divid Hubbard. He

in representing Hubbard on appeal, Marshall caused him voluntarily to dismiss his appeal by failing to advise him that he was entitled to a transcript free of charge. He dismissed his appeal because he was unable to pay for a transcript of the trial court proceedings (which he would need to prosecute the appeal).

Hubbard is, in essence, asking us to expand the present habeas petition – which seeks relief from his 1982 conviction – to include a collateral attack on his 1957 conviction. Three recent decisions of United States Supreme Court, considered together, preclude us from doing this. See Custis v. United States, 511 U.S. 485, 114 S. Ct. 1732, 128 L. Ed. 2d 517 (1994); Daniels v. United States, 532 U.S. 374, 121 S. Ct. 1578, 149 L. Ed. 2d 590 (2001); Lackawanna County Dist. Attorney v. Coss, 532 U.S. 394, 121 S. Ct. 1567, 149 L. Ed. 2d 608 (2001).

A.

In Custis, the Court granted certiorari "to determine whether a defendant in a federal sentencing proceeding may collaterally attack the validity of previous state convictions that are used to enhance his sentence." 511 U.S. at 487, 114 S. Ct. at 1734. On finding no statutory authorization for such a collateral attack, and noting that the defendant was not contending that the previous convictions were

---

thereafter testified as a prosecution witness at Divid's trial. This was a departure from Hubbard's 1957 trial testimony – during which he claimed self-defense – although consistent with a statement he gave the police following his arrest.

18

invalid under <u>Gideon v. Wainwright</u>, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d. 799 (1963), because the state obtained them after denying him the benefit of court-appointed counsel, the Court held that the defendant could not challenge his state court convictions at the federal sentencing hearing.

In <u>Daniels</u>, the Court considered an issue <u>Custis</u> did not present: "whether, after the sentencing proceeding has concluded, the [defendant] may challenge his federal sentence through a motion under 28 U.S.C. § 2255 (1994 ed., Supp. V) on the ground that his prior convictions [which had been used to enhance his sentence] were unconstitutionally obtained," and held that he may not.  532 U.S. at 376, 121 S. Ct. at 1580.  Daniels attacked his federal sentence on the ground that the prior convictions were invalid as a result of constitutionally inadequate guilty pleas and the ineffective assistance of counsel.  The court pointed out that Daniels "could have pursued his claims while he was in custody on those convictions.  As his counsel conceded at oral argument, there is no indication that [he] did so or that he was prevented from doing so by some external force."  <u>Id.</u> at  384, 121 S. Ct. at 1584.  Because Daniels had not pursued his claims – either on direct appeal or on collateral attack (in state or federal court) – he was "without recourse."  The "presumption of validity" that attached to his prior convictions at the time of sentencing was "conclusive," and he could not collaterally attack them under

section 2255.  Id. at 382, 121 S. Ct. at 1583.  Allowing section 2255 to be used as a vehicle for challenging long-past convictions, the Court noted, "would effectively permit challenges far too stale to be brought in their own right, and sanction an end run around statutes of limitations and other procedural barriers that would preclude the movant from attacking the prior conviction directly."  Id. at 383, 121 S. Ct. at 1584.

Lackawana County, which involved a habeas petitions brought under 28 U.S.C. § 2254, was decided the same day as Daniels and adopted its rationale.  The Supreme Court held that

> once a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid.  If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence thought a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

532 U.S. at 403-404, 121 S. Ct. at 1574 (citation omitted).[20]

---

[20]  We note that the Supreme Court recognized an exception to the general rule set forth in Lackawanna County (and also in Daniels) for cases in which the prior conviction (used to enhance the defendant's sentence) was obtained without the benefit of counsel, in violation of Gideon v. Wainwright, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).  Lackawanna County, 532 U.S. at 404, 121 S. Ct. at 1574.  As noted earlier, this exception is not implicated in Hubbard's case because he was represented by retained counsel in 1957.  Justice O'Connor also recognized that a possible exception might exist when a state court has, without justification, refused to rule on a properly presented constitutional claim or when the defendant has obtained

B.

Hubbard has previously obtained several reviews of his claims that his 1957

conviction is constitutionally infirm (for the reasons he asserts in the instant

petition). In 1963 and again in 1969, he petitioned the Circuit Court of Tuscaloosa

for a writ of coram nobis. Judge W.C. Warren held an evidentiary hearing on the

first petition, and found Hubbard's claims meritless.[21] In 1969, Hubbard returned

to that court with a second petition for a writ of coram nobis. Following an

evidentiary hearing, Judge Aubrey Dominick entered an order denying relief,

observing that the grounds for relief were the same as those asserted in the 1963

---

compelling evidence of innocence after the time for direct or collateral review has passed. Id. at 405, 121 S. Ct. at 1574-75. She noted that in such situations, a habeas petition directed at the enhanced sentence may be the first, and only, forum available for review of the prior conviction. Justice O'Connor, however, wrote only for a plurality with respect to her discussion of these latter two exceptions, neither of which is applicable here.

[21] Judge Warren received testimony from Hubbard and Marshall about Marshall's representation of Hubbard in the trial court and the dismissal of Hubbard's appeal. The court also heard the testimony of witnesses Marshall did not call in Hubbard's defense – allegedly due to his conflict of interest. In his order denying coram nobis relief, Judge Warren recounted the evidence bearing on Hubbard's claims, made a series of factual findings, and concluded:

> that at all times after commission of the [1957] crime the petitioner has received both fair and equitable treatment and has in no instance been deprived of any right accorded and afforded to him either by common law, legislative act, the Constitution of Alabama, the Constitution of the United States of America, or of any other right of which this Court knows or has been informed or had brought to its attention.

21

petition and that the evidence showed nothing new.[22]   The Alabama Court of Criminal Appeals affirmed the ruling without opinion.

Having no success before these coram nobis courts, Hubbard repaired to the United States District Court for the Northern District of Alabama, seeking habeas corpus relief under section 2254.  Again, he came away empty-handed.  On June 30, 1971, the court entered an order dismissing his petition on the ground that his claims lacked merit.  On September 29, 1971, the Fifth Circuit Court of Appeals denied Hubbard's application for a certificate of probable cause.  Hubbard thereafter filed a second habeas petition with the district court, which was denied on March 29, 1974.

Hubbard's section 2254 access to the federal courts is now blocked with respect to his 1957 conviction.  He demonstrates nothing that would support an application to this court for leave to file a successive petition, see 28 U.S.C. § 2244(b), and he is no longer "in custody" under his 1957 sentence, see Maleng v. Cook, 490 U.S. 488, 492, 109 S. Ct. 1923, 1926, 104 L. Ed. 2d 540 (1989) (holding that petitioner is not "in custody" under a conviction after the sentence has expired just because the prior conviction is used to enhance a subsequent

_____

[22]   In his dispositive order, Judge Dominick noted that the testimony Hubbard and Marshall gave at the hearing was essentially the same as the testimony they gave in the 1963 hearing before Judge Warren.

sentence). In sum, under the Supreme Court's combined holdings in <u>Custis</u>, <u>Daniels</u>, and <u>Lackawana County</u>, we regard Hubbard's 1957 as "conclusively valid." <u>Lackawana County</u>, 532 U.S. at 403, 121 S. Ct. at 1574. No constitutional error occurred, therefore, when the trial judge permitted the State to introduce that conviction into evidence at Hubbard's trial.

IV.

Third, Hubbard claims that he received constitutionally ineffective assistance of counsel prior to the commencement of his 1982 trial because his attorneys, Hendrix and Stilson, failed to support their motion to suppress the Marcum statement with (1) expert testimony establishing that he was likely suffering from delirium tremens when he made the statement and (2) the records of his in-patient treatment at Bryce Hospital describing his alcoholism and low I.Q. Such expert testimony and hospital records, he submits, would have convinced the court that the Marcum statement was involuntary. We analyze this claim under the two-prong test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which requires a showing of both unreasonably ineffective assistance and prejudice, <u>id.</u> at 687, 104 S. Ct. at 2064.

Hubbard first raised this challenge in the Rule 20 petition he filed after his conviction and sentence had been affirmed on direct appeal and the supreme court

had denied certiorari review. See Hubbard v. State, 584 So. 2d 895, 903-04, 907 (Ala. Crim. App. 1991) (quoting the findings contained in the circuit court's denial of Hubbard's Rule 20 petition). After holding an evidentiary hearing at which both Hendrix and Stilson testified, the Tuscaloosa County Circuit Court, in a written order denying relief, found that the attorneys had acceptable tactical reasons for not offering the evidence which, according to Hubbard, should have been adduced in support of his motion to suppress. We have examined the record and find ample support for the court's findings; we therefore presume them to be correct. Given the court's findings, we cannot conclude that Hendrix and Stilson's decision not to introduce the hospital records or seek expert testimony were so unreasonable as to have deprived Hubbard of his Sixth Amendment right to the effective assistance of counsel.

Furthermore, Hubbard has failed to show Hendrix and Stilson's failure to present such evidence caused him prejudice, as required under Strickland's second prong. We so conclude because it is highly unlikely that the trial court would have granted Hubbard's motion to suppress had counsel established – through the evidence at issue – that Hubbard was an alcoholic. The court was well aware that Hubbard was an alcoholic; it had been informed by Hubbard's attorneys (at the hearing on their motion to suppress) that he may have been experiencing alcohol

24

withdrawal and delirium tremens when he signed his statement. The court heard eyewitnesses testify that Hubbard did not appear to be suffering from delirium tremens at that time. Moreover, the standard in Alabama (in 1982) governing the admissibility of a confession or statement given by a person experiencing withdrawal symptoms required a showing of "such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words." Myers v. State, 431 So. 2d 1342, 1345 (Ala. Crim. App. 1982) (citations omitted). Under this standard, there is no reasonable probability that, but for Hendrix and Stilson's failure to offer the evidence at issue, the court would have suppressed Hubbard's statement. Similarly, when presented with a defendant who contends that he was suffering from a mental impairment when he gave his statement, the court is required to determine whether the defendant could understand his Miranda rights such that he could knowingly and intelligently waive them. See Hines v. State, 384 So. 2d 1171, 1180 (Ala. Crim. App. 1980). Not only do the hospital records not support a finding in Hubbard's favor under this standard, other evidence presented to the court, including the report of the Lunacy Commission (issued on June 10, 1977), establish that Hubbard was capable of understanding the charges against him and making informed decisions. It is therefore unlikely that Hubbard was prejudiced by his attorneys' failure to bring this particular evidence

25

to light at the time they moved to suppress the statement.

Hubbard has pointed to nothing in the hospital records or in any expert testimony that persuades us that, had his counsel introduced this evidence, the court would have granted his motion to suppress the statement. Of course, that is not even the relevant inquiry under Strickland. Rather, even if we were persuaded that the statement would have been suppressed, Hubbard has failed to carry his ultimate burden – proving that, but for his counsel's neglect, the outcome of his trial would have been different. We accordingly affirm the denial of Hubbard's claim that trial counsel's pre-trial performance was constitutionally ineffective.

V.

Hubbard contends that counsel rendered ineffective assistance at trial when they failed to object (1) to the admission of the Marcum statement on the ground that Marcum's conduct in giving him a drink of whiskey, so he could sign the statement, denied him due process of law, and (2) to the court's instruction to the jury on the element of malice.[23]

A.

---

[23] The district court also granted Hubbard a certificate of appealability on the issue of trial counsel's failure to obtain a state-funded psychiatric expert to testify as to the effects of his alcoholism, both in support of his objections to the admission of the Marcum statement and for use as mitigating evidence during the sentencing phase of the trial. We disposed of the first issue in part IV. We resolve the second issue in part VI, where we address Hubbard's claims of ineffective assistance at sentencing.

Hubbard first asserts that, although counsel did object at trial to the admissibility of the Marcum statement as involuntary, they also should have challenged it on the ground that Marcum improperly provided him with alcohol immediately before he signed the statement. In support of this charge, Hubbard has offered no evidence either that his counsel acted unreasonably in failing to raise this particular objection or that this failure prejudiced him; consequently, he has failed to carry his burden under Strickland. Moreover, our examination of the record reveals that Hubbard's counsel did bring Marcum's misconduct to the attention of the judge, in attempting to suppress the statement as involuntary. They did not argue, as Hubbard seems to suggest they should have, that Marcum's misconduct alone was sufficient to warrant the suppression, but we cannot say that this decision was patently unreasonable. Instead, the Supreme Court has recognized that defense counsel, in defending their client's interests, need not urge every conceivable objection the law would provide. See Engle v. Isaac, 456 U.S. 107, 133-34, 102 S. Ct. 1558, 1575, 71 L. Ed. 2d 783 (1982). Finally, the trial judge, aware of Marcum's misconduct, did not find it sufficient to justify excluding the statement, even when combined with the evidence of Hubbard's alcoholism, under the totality of the circumstances approach. Hence, it is highly improbable that the court would have chosen to exclude the statement based on an

27

objection of police misconduct alone.  Hubbard's redirected siege on the admissibility of the Marcum statement accordingly fails.

B.

Hubbard next complains that the trial court's instruction to the jury regarding malice impermissibly shifted the burden of proof on that element to him. That instruction read:

> Malice may arise on the instant and from the use of a deadly weapon whereby one intentionally takes the life of another.  The law raises a prima facie presumption that the killing was done maliciously unless the circumstances of the killing disprove malice.  The intentional and unjustifiable use of a deadly weapon in a deadly manner raises the presumption of malice. . . . If one person intentionally shoots another with a gun . . . and death ensues, the law implies or presumes malice.  And imposes upon the slayer the burden of rebutting this presumption by other proof unless the evidence which proves the killing rebuts the presumption.

This type of burden-shifting instruction has been held unconstitutional by the Supreme Court in Sandstrom v. Montana, 442 U.S. 510, 524, 99 S. Ct. 2450, 2459, 61 L. Ed. 2d 39 (1979).  The Tuscaloosa County Circuit Court, in denying Hubbard's Rule 20 petition for post-conviction relief, found that, even if the malice instruction was unconstitutional, the failure of Hubbard's counsel to challenge that instruction constituted harmless error.  See Hubbard v. State, 584 So. 2d 895, 913-14 (Ala. Crim. App. 1991).  As that court noted, when Hubbard elected to pursue an alibi defense at trial, he conceded the element of intent the malice instruction

28

addresses.  See McCleskey v. Kemp, 753 F.2d 877, 904 (11th Cir. 1985) (en banc).

Since Hubbard himself removed intent as an issue in the case, any error resulting

from the court's instruction was harmless.  See id. (holding that "where the State

has presented overwhelming evidence of an intentional killing and where the

defendant raises a defense of nonparticipation . . . a Sandstrom violation on an

intent instruction . . . is harmless beyond a reasonable doubt").  As the jury had no

choice but to find that Hubbard acted with malice once they had found him guilty

of Montgomery's murder, there is no reasonable probability that the result of his

trial would have been different had his attorneys objected to the malice instruction.

VI.

Finally, Hubbard cites as ineffective assistance, during the sentencing phase

of his trial, his attorneys' failure (1) to introduce mitigating evidence, including

expert testimony of the effects of his alcoholism, and (2) to object to the

prosecutor's comments in closing argument.  As with the preceding claims,

Hubbard must show that Hendrix and Stilson's failure to explore the mitigating

evidence and make the objection constituted a deficient performance, and that he

was prejudiced as a result.  See Strickland, 466 U.S. at 686-87, 104 S. Ct. at 2064.

A.

The sentencing phase of the jury trial began moments after the jury

29

convicted Hubbard of first degree murder. Hubbard first complains that his attorneys performed unreasonably (1) in not seeking a continuance in order to consult with him regarding potential witnesses they might call and their closing argument to the jury, and (2) in failing to introduce any evidence that may have mitigated his sentence.

This court and the Supreme Court have consistently held that there is "[n]o absolute duty . . . to introduce mitigating or character evidence." Chandler v. United States, 218 F.3d 1305, 1319 (11th Cir. 2000) (en banc) (citing Burger v. Kemp, 483 U.S. 776, 794-95, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)). Counsel who fail to present any mitigating evidence, even when it is available at sentencing, may still be deemed constitutionally effective, see, e.g., Burger, 483 U.S. at 794-96, 107 S. Ct. at 3126, provided that the decision not to present mitigating evidence was a tactical one based on the results of a reasonable investigation, see Strickland, 466 U.S. at 690-91, 104 S. Ct. at 2066.

At the evidentiary hearing before the Rule 20 court, Hendrix and Stilson testified that they did discuss calling witnesses before ultimately deciding not to do so. They based this decision, in part, on the fact that Hubbard did not, and likely could not, provide them with the names of any potential witness – his family had

30

not even attended the trial and he knew few people in the community[24] – and on the fact that the prosecution had rebuttal witnesses ready to testify.  Although Hubbard now claims that trial counsel "could have produced family, friends, and witnesses who could have testified concerning Hubbard's alcoholism, mental retardation, and his previous successful adjustments to prison," he does not offer any proof that such witnesses existed or were available to testify at the time of his trial.

Hubbard also finds fault with counsel's decision not to use the Bryce Hospital records, which, in conjunction with the testimony of an expert witness, could have informed the jury of his history of alcoholism, mental retardation, and deprived upbringing.[25]  However, the Rule 20 court found that any evidence of Hubbard's alcoholism and mental state would have been "more than offset" by reports from the Lunacy Commission which determined that Hubbard had not suffered from any mental disease or defect at the time of the Montgomery murder that could have mitigated his criminal responsibility.  The evidence in the record supports the Rule 20 court's finding, and we therefore presume it to be correct.

---

[24]  With the exception of the three-month period prior to the Montgomery murder, Hubbard had been in custody since the Dockery murder in 1957.

[25]  Although they did not rely on the hospital records or offer expert testimony, Hendrix and Stilson did rely at sentencing on previously admitted evidence regarding Hubbard's habit of drinking and his intoxication on the morning of the murder, arguing to the jury that these factors mitigated the crime.

31

Finally, we cannot conclude that Hendrix and Stilson rendered ineffective assistance in refusing to present evidence of voluntary intoxication where their client was maintaining a factual innocence claim. See Nelson v. Nagle, 995 F.2d 1549, 1554 (11th Cir. 1993); see also Buenoano v. Singletary, 74 F.3d 1078, 1084 (11th Cir. 1996) (holding that such an approach "could leave the jury with the impression that [the defendant] admitted committing the crime and was seeking sympathy or excuse because of [his] background"). In sum, we cannot say that Hubbard's trial counsel performed unreasonably at the sentencing phase of his trial.

Moreover, Hubbard has failed to establish any prejudice as a result of counsel's actions. The court, in sentencing Hubbard to death, specifically found three aggravating factors: (1) that Hubbard killed Montgomery for pecuniary gain; (2) that he had done so within twenty years of the 1957 second degree murder conviction; and (3) that he murdered Montgomery in a cruel, malicious, and heinous manner. There is simply no evidence that character witnesses and evidence of Hubbard's alcoholism, if presented during the sentencing phase of the case, would have outweighed these aggravating factors. Hubbard's claim therefore fails under both prongs of the Strickland analysis.

B.

32

Finally, Hubbard argues that his trial counsel were ineffective in failing to object to four comments the prosecutor made in closing argument during the sentencing phase. These allegedly improper comments include: (1) that, "[g]iven the opportunity, [Hubbard] would kill again;" (2) that, "if anyone anywhere ever deserved the death sentence, [Hubbard] deserved [it];" (3) a "promise" that he would witness Hubbard's execution; and (4) his expression of his personal opinion that "the death penalty is a valid means of punishment."

Hendrix testified at the Rule 20 hearing that it was his general approach not to "jump up and down" with objections during the prosecution's presentation, thereby "annoying" the jury. Stilson testified that he decided not to object because he did not believe the prosecutor's presentation was particularly effective. It is clear from this evidence that Hendrix and Stilson performed as reasonably competent attorneys, according to "sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. 2065 (citation omitted). Furthermore, there is no reasonable probability that the prosecutor's comments were so egregious or prejudicial that the result of the sentencing hearing would have been different had Hubbard's counsel objected.

## VII.

Having thoroughly considered each of the claims framed in the certificate of appealability, we find that none entitles Hubbard to habeas relief. The judgment of

33

the district court is, accordingly,

AFFIRMED.