[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15878
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 27, 2010
JOHN LEY
CLERK

D. C. Docket No. 09-00049-CR-JEC-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY SAGOES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(July 27, 2010)

Before TJOFLAT, EDMONDSON and BIRCH, Circuit Judges.

PER CURIAM:

A Northern District of Georgia found Anthony Sagoes guilty of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), and the district court sentenced him to prison for 216 months. He now appeals his conviction and sentence. Sagoes challenges his conviction on three grounds. First, the district court erred in denying his motion to suppress statements he made to an agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") while in custody and after being advised of his *Miranda*[1] rights; he argues that the statements were tainted by an Atlanta Police Department ("APD") officer's previous questioning of him in the absence of an advice of rights. Second, he challenges the sufficiency of the evidence to prove beyond a reasonable doubt that he had either actual or constructive possession of the firearm at issue; third, he argues that the district court abused its discretion in preventing him from cross-examining a witness regarding the theory of his defense. Sagoes attacks his sentence on the ground that the court erred in treating him as an armed career offender under U.S.S.G. § 4B1.4. We find no merit in Sagoes's appeal and, accordingly, affirm his conviction and sentence.

I.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2

We consider first the argument that the district court erred in denying Sagoes's motion to suppress.

## A.

These are the circumstances bearing on the court's ruling. In the late afternoon of January 8, 2009, twenty-two APD officers arrived at the residence located at 7 Gould Street in Atlanta to execute a search warrant for crack cocaine and other evidence of drug trafficking.[2] On arrival, the officers found numerous individuals on the front porch; they placed them in handcuffs, and had them sit down. As the officers approached the front door with guns drawn, Sagoes opened it. Officer Vayens recognized him as someone who previously had sold drugs to a confidential informant. He handcuffed Sagoes and asked him if there were any weapons or drugs in the house; Sagoes said there might be a toy handgun. Vayens asked Sagoes where his bedroom was located; Sagoes said it was in the right rear of the house. Vayens spoke to Sagoes without advising him of his <u>Miranda</u> rights. Their conversation lasted no more than a minute.

After the officers cleared the house of individuals, and handcuffed and placed them on the porch with the others—there were over 30 people on the porch—the officers searched the house. They uncovered crack cocaine, marijuana, scales, and

---

[2] It turned out that the house was under lease to Sagoes.

3

empty plastic baggies in various locations, and, in Sagoes's bedroom, a pistol in the entertainment center and a single hit of crack cocaine.  On finding the gun, the officers contacted the ATF.  Special Agent Joseph of the ATF was aware that the search of the Gould Street residence was underway,[3] and he and Officer Oliver, who was assigned to Joseph's ATF task force on drugs, drove to 7 Gould Street, intending to question Sagoes about the firearm.  They arrived at the scene in about 30 minutes.  The magistrate judge, to whom the district court referred Sagoes's motion to suppress, described what took place after Joseph contacted Sagoes.

> When Agent Joseph first made contact with [Sagoes], he allowed [him] to use the bathroom inside the residence. . . .Then Agent Joseph took [Sagoes] to a marked APD vehicle in front of the property. At this time, there were still numerous APD officers and civilians in and around the property.  Agent Joseph sat in the back seat of the police car with [Sagoes], while [Officer] Oliver sat in the front seat. . . . No APD officers who participated in the execution of the search warrant participated in Agent Joseph's conversation with [Sagoes].   Although Agent Joseph was armed, he kept his firearm concealed from [Sagoes]  during the interview. Agent Joseph then read [Sagoes] his Miranda rights from a pre-printed "Advice of Rights and Waiver" form.  Agent Joseph showed the form to [Sagoes] as he read the form. [Sagoes] leaned over toward Agent Joseph as Agent Joseph read the form and appeared to be following along with Agent Joseph's recitation of his Miranda rights.  When Agent Joseph finished reading [Sagoes] his Miranda rights, he read the waiver language from the "Advice of Rights and Waiver" form. [Sagoes] then agreed to speak with Agent Joseph and

---

[3]  He was part of an ATF task force that included Atlanta police officers.

4

answered his questions. [Sagoes's] oral statement to Agent Joseph lasted approximately thirty (30) minutes. [Sagoes] began by telling Agent Joseph that the APD had already asked him whether there were any drugs present in the residence and that he . . . responded that there should not be. Agent Joseph asked [Sagoes] whether there were any firearms in the residence, and [he] said that there was a toy gun in his bedroom. Agent Joseph then told [him] that APD had found a real gun. [Sagoes] eventually said, among other things, that he was holding a firearm for a female friend named "Dee." He stated that he had had the firearm for approximately one week and that he kept it in his bedroom. [Sagoes] described the firearm and said that it was loaded. [Sagoes] signed the pre-printed waiver of rights form after the oral interview had ended. Agent Joseph verified that [Sagoes] signed the form, which stated that [he] understood his rights, waived those rights, and agreed to speak with Agent Joseph. Agent Joseph and [Officer] Oliver signed the form as witnesses after [Sagoes] signed it. After [that], Agent Joseph prepared a written statement based on [Sagoes's] oral statements and read the written statement to [Sagoes] several times. [Sagoes] signed the written statement. [The] entire conversation . . . lasted approximately 45 minutes.

B.

Sagoes moved the district court to suppress his statements to Vayens and Joseph. The district court referred the motion to a magistrate judge, who held an evidentiary hearing. At the outset of the hearing, the Government stated that it would not attempt to use Sagoes's statements to Vayens at trial; the question then became whether those statements, taken as they were without a *Miranda* warning, tainted and rendered inadmissible the subsequent statements to Joseph. After

5

considering the parties' submissions, the magistrate judge found that Sagoes's statements to Vayens were voluntary, that law enforcement did not use calculated tactics to undermine Sagoes's *Miranda* rights,[4] that Sagoes spoke to Joseph after waiving his *Miranda* rights, and that his statements to Joseph were voluntary. In her report to the district court, the magistrate judge therefore recommended that the motion to suppress be denied. The court, after reviewing the record, adopted the recommendation and denied the motion.

## C.

In reviewing the denial of a motion to suppress, we examine the district court's findings of fact for clear error and its application of the law to those facts *de novo*. *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1132 n.4 (11th Cir. 2006). "Even where a suspect, while in custody, has answered unwarned questions from police, the suspect still may validly waive his *Miranda* rights and provide admissible statements after *Miranda* warnings." *Id.* at 1133 (citing *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985)). The "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that

---

[4] The magistrate judge found that at the time Joseph questioned Saegoes, Joseph did not know that the information he had learned about the gun had come from Sagoes, much less that Sagoes had been questioned by the APD without having been advised of his *Miranda* rights.

6

precluded admission of the earlier statement." *Id.* "[T]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made." *Id.* at 1133-34. In the absence of circumstances showing otherwise, a defendant's waiver of *Miranda* rights is presumed to be voluntary. *Id.* at 1137.

One exception to the rule set forth in *Elstad* is when police utilize a two-step interrogation technique, calculated to undermine the *Miranda* warning, whereby they use an unwarned incriminating statement to solicit a post-*Miranda* confession. *Id.* at 1135-36 (citing *Missouri v. Seibert*, 542 U.S. 600, 622, 124 S.Ct. 2601, 2616, 159 L.Ed.2d 643 (2004)). In these infrequent instances, any post-*Miranda* statement, substantively related to the pre-*Miranda* statement, must be excluded unless other curative measures are taken to ensure that the import and effect of the *Miranda* warning was properly conveyed. *Id.* In determining whether an impermissible two-step interrogation technique was utilized, we consider the "totality of the circumstances, including the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements." *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006).

We determine whether a statement was made voluntarily, and thus was "the product of an essentially free and unconstrained choice," by examining the totality of the circumstances. *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003). Among the factors we consider are "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* at 1253. This is not an exclusive list of factors that may be considered, however "the absence of official coercion is a *sine qua non* of effective consent." *Id.*

Considering the totality of the circumstances, we agree with the district court that Sagoes's statements to Vayens were voluntarily. The conversation lasted less than one minute, and Sagoes was not threatened, promised anything, or physically coerced into speaking. *See Hubbard*, 317 F.3d at 1252. Further, because Sagoes's statements to Joseph were made more than 30 minutes later, in a different setting, to a different officer, who was unaware of Vayens's prior questioning, and because there was very little overlap in the content of Sagoes's statements to Vayens and Joseph, we conclude that this case does not fall under the exception in *Seibert*. In sum, the court did not err in denying Sagoes's motion to suppress.

II.

8

When, as here, the defendant fails to move for judgment of acquittal at the close of all the evidence, we review the sufficiency of the evidence to convict only for a "manifest miscarriage of justice," which requires "a finding that the evidence on a key element of the offense is so tenuous that a conviction would be shocking." *United States v. Milkintas*, 470 F.3d 1339, 1343 (11th Cir. 2006) (internal quotations omitted). In doing so, we "must view the evidence in the light most favorable to the government and accept all reasonable inferences and credibility determinations that support the jury's verdict." *Id.*

To convict an accused of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), the government must prove beyond a reasonable doubt three elements: (1) that the defendant was a convicted felon, (2) that the defendant was in knowing possession of a firearm, and (3) that the firearm was in or affecting interstate commerce. *United States v. Wright*, 392 F.3d 1269, 1273 (11th Cir. 2004). To satisfy the second prong, the government may prove either actual or constructive possession, using either direct or circumstantial evidence. *Id.* "To prove actual possession the evidence must show that the defendant either had physical possession of or personal dominion over the thing allegedly possessed." *United States v. Leonard*, 138 F.3d 906, 909 (11th Cir. 1998). "Constructive possession exists when a defendant has ownership, dominion, or control over an

object itself or dominion or control over the premises or the vehicle in which the object is concealed." *Id.*

Viewing the evidence in the light most favorable to the Government, we conclude that the evidence was sufficient to demonstrate that Sagoes was in knowing possession of the gun found in his bedroom. Although he asserted that he was just holding the gun for a friend, he admitted that he had been keeping it in his bedroom for two weeks. Since he had dominion and control over the house, the bedroom in which the gun was found, and the gun itself, the evidence was sufficient to demonstrate that he had constructive possession of it. *See Leonard*, 138 F.3d at 909.

### III.

We review a district court's restriction of cross-examination for abuse of discretion. *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1371 (11th Cir. 1994). In general, "courts should not prohibit a defendant from presenting a theory of defense to the jury." *United States v. Thompson*, 25 F.3d 1558, 1564 (11th Cir. 1994). However, the defendant must offer "some relevant factual basis for the defense . . . before evidence or testimony is offered." *Id.* "If a defendant offers no relevant evidence to support a defense, the court may properly bar its presentation at trial." *United States v. Anton*, 546 F.3d 1355, 1357 (11th Cir. 2008), *cert. denied*, 129 S.Ct. 2033 (2009).

The testimony the district court precluded obviously was not relevant to Sagoes's theory of defense, and since his theory of defense would not have negated his guilty for the crime charged, we conclude that the court did not abuse its discretion in limiting the cross-examination as it did. *See Anton*, 546 F.3d at 1357.

IV

We review *de novo* a district court's interpretation and application of the sentencing guidelines, as well as the district court's decision to classify a defendant as an armed career criminal. *United States v. Gibson*, 434 F.3d 1234, 1243 (11th Cir. 2006). Whether a defendant's prior convictions qualify him as an armed career criminal, pursuant to U.S.S.G. § 4B1.4 is a question of law to be answered by the court. *Id.* at 1247-48. "[J]udicial fact-finding of a defendant's prior convictions does not violate the Sixth Amendment, even though a criminal defendant generally has the right to have all facts that enhance his sentence proven to a jury beyond a reasonable doubt." *Id.* at 1249-50. The Supreme Court has affirmed this rule in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) . *Id.* at 1250. Because the district court was authorized to make findings of fact regarding Sagoes's prior convictions for purposes of sentencing him as an armed career

11

criminal, and because Sagoes did not have a right to have his prior convictions proven by a jury beyond a reasonable doubt, the district court did not violate his rights in determining his career offender status.

IV.

For the foregoing reasons, Sagoes's conviction and sentence are AFFIRMED.