**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**May 11, 2004**

Charles R. Fulbruge III
Clerk

Revised May 19, 2004

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 03-41130

———————————

ROBERT BRICE MORROW

Petitioner - Appellant

v.

DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas
No. 6:00-CV-402

Before KING, Chief Judge, and EMILIO M. GARZA and BENAVIDES,
Circuit Judges.

PER CURIAM:[*]

Robert Brice Morrow was convicted of capital murder by a
Texas jury and sentenced to death. After exhausting his state
remedies, Morrow filed a § 2254 petition for a writ of habeas
corpus in federal district court in which he alleged, <u>inter alia</u>,
that his trial counsel had been constitutionally ineffective.
The district court granted the State's motion for summary

———————————

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

judgment and refused to grant a certificate of appealability ("COA") on any of Morrow's claims. Morrow now seeks a COA from this court for his claims that his trial attorneys rendered ineffective assistance by failing to make multiple objections during the prosecutor's cross examination of him. For the following reasons, we DENY Morrow's request for a COA.

## I.  BACKGROUND

On the evening of April 3, 1996, Lisa Allison took her father's car to a local carwash but never returned home. At Morrow's trial for capital murder, Bryan McNeil testified that he saw Allison at the carwash that night as he was cleaning his truck. McNeil noticed a man crossing the street toward the carwash; although McNeil never positively identified Morrow, Morrow matched the physical description that McNeil provided. Subsequently, while McNeil was filling his truck with gasoline, he heard a short, startling scream and observed that the man who had crossed the street was laying on top of Allison in the front seat of her car. Although McNeil could not see the man's hands at any time during this incident, he hypothesized that the two individuals were boyfriend and girlfriend because Allison did not appear to be struggling. A few moments later, the man shifted his position, Allison slid over to the driver's seat, and the man moved into the passenger seat of the car. Allison then drove the car, with the man inside, in the direction of the Trinity River.

2

Testimony and evidence presented at Morrow's trial indicated that the authorities discovered Allison's body in the Trinity River the next morning. An autopsy revealed that she had been beaten before death and had sustained numerous injuries. The autopsy also suggested that her death was caused by a combination of several skull fractures and a large cutting wound to her neck that severed her jugular vein. Later that day, the authorities found Allison's father's car abandoned within a few miles of Morrow's house. A number of hair and blood samples from inside the car matched the victim, Allison, while other blood stains matched Morrow's DNA profile. In particular, the DNA extracted from a blood stain on the rear seat was consistent with a mixture of Allison's and Morrow's DNA.

In addition, Cecil Smith, one of Morrow's acquaintances, testified that Morrow told him--prior to Allison's death--that it would be relatively easy to abduct a woman from this particular carwash at knife point, rob her, and sell her possessions for drug money. Morrow's friend, Dane Schisler, also testified that he had dropped Morrow off at the store across the street from the gas station and carwash on April 3, 1996, at approximately the same time that McNeil observed the man who fit Morrow's description approach the carwash. Moreover, Brad Keaton, another of Morrow's acquaintances, testified that he saw Morrow walking down the road toward his house at around midnight on April 3, 1996. According to Keaton, Morrow had scratches on his arm and a

3

good deal of blood on his arms and legs. Keaton's description of the clothes worn by Morrow was consistent with McNeil's description of the clothing worn by the man who approached Allison at the carwash earlier that night. Keaton stated that Morrow claimed he had received his injuries in a car wreck.

Morrow exercised his right to testify in his own defense, and, during his direct examination, Morrow claimed that he did not commit the crime. Nevertheless, the jury found Morrow guilty of capital murder and sentenced him to death. The Texas Court of Criminal Appeals affirmed his conviction and the United States Supreme Court denied his petition for certiorari. Morrow then filed an application for a writ of habeas corpus in the state trial court in which he claimed, inter alia, that his trial attorneys had been constitutionally ineffective when they failed to object to numerous questions and comments made by the prosecutor during Morrow's cross examination. The state court rejected the application. In an unpublished opinion, the Texas Court of Criminal Appeals adopted the state habeas court's findings of fact and conclusions of law and denied Morrow's request for relief.

Morrow then filed a petition for habeas corpus under 28 U.S.C. § 2254 (2000) in federal district court, reasserting his contention that his trial counsel's conduct during his cross examination was constitutionally deficient. The district court granted the State's motion for summary judgment and denied

4

Morrow's request for a COA. Thereafter, Morrow filed an application for a COA with this court.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), Morrow must obtain a COA before appealing the district court's denial of habeas relief. See 28 U.S.C. § 2253(c) (2000); Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003). To obtain a COA, Morrow must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has stated that, to make a "substantial showing," a petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 336 (quotation marks omitted). Additionally, "[b]ecause the present case involves the death penalty, any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000).

Although we need not decide whether Morrow's appeal ultimately will succeed at this stage in the proceedings, the COA determination does require "an overview of the claims in the habeas petition and a general assessment of their merits." Miller-El, 537 U.S. at 336; accord Henderson v. Cockrell, 333

5

F.3d 592, 604 (5th Cir. 2003). In making this assessment, we are mindful of the deferential standard of review that AEDPA required the district court to apply to Morrow's claims. See Miniel v. Cockrell, 339 F.3d 331, 336 (5th Cir. 2003). Because the state habeas court adjudicated Morrow's ineffective-assistance claim on the merits, the district court was required to defer to that court's decision--that Morrow's counsel was not constitutionally defective--unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Moreover, the state court's factual findings enjoy a presumption of correctness, which Morrow bore the burden of rebutting "by clear and convincing evidence." Id. § 2254(e)(1).

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Under Strickland v. Washington, 466 U.S. 668, 687 (1984), to establish ineffective assistance of counsel, Morrow was required to show both that his counsel's performance was deficient and that this deficient performance prejudiced his defense. Habeas relief is unavailable if Morrow fails to establish either prong of the Strickland analysis. Riley v. Cockrell, 339 F.3d 308, 315 (5th Cir. 2003); see Strickland, 466 U.S. at 697 ("[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). To prove that his counsel was constitutionally deficient, Morrow

6

must show that his trial counsel's performance fell below an objective standard of reasonableness.  <u>Strickland</u>, 466 U.S. at 690.  The Supreme Court has cautioned courts not to second-guess counsel's decisions through the distorting lens of hindsight, however: thus, we must employ "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and], under the circumstances, . . . might be considered sound trial strategy."  <u>Id.</u> at 689 (citations and internal quotation marks omitted).  In addition to proving his attorneys' deficiencies, Morrow must also demonstrate that he was prejudiced by their unprofessional performance.  That is, Morrow "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.

In the district court, Morrow claimed that his counsel rendered ineffective assistance during his cross-examination by the prosecuting attorney.  Morrow enumerated a plethora of objections he believes should have been made--to both the prosecutor's questions and his comments responding to Morrow's answers.  According to Morrow, had his attorneys objected, the trial court would have sustained their objections and the jury might then have acquitted him of capital murder.  We group these objections into relevant categories and examine each in turn.

7

*1. Prosecutor's Mode of Interrogation*

Morrow first contends that his attorney was deficient for failing to object to the format of the prosecutor's questions. Morrow claims that the prosecutor "contracted" with him "concerning the scope of [the] cross-examination" by promising only to ask questions calling for a "yes," "no," or "I don't know" answer. The state habeas court disagreed, noting that the prosecutor merely stated that he was "gonna try to" follow this format. The state court found that Morrow's attorneys did not object to the open-ended questions subsequently posed by the prosecutor because they felt any objection would be overruled and that numerous interruptions might cause Morrow, who they believed to be temperamental, to "loos[e] his cool" in front of the jury. Because Morrow proffered no evidence to rebut these factual findings, the district court held that counsel's decision not to object to the mode of interrogation was objectively reasonable. In light of these findings, we do not believe that reasonable jurists would debate or find wrong the district court's conclusion that counsel's inaction was based on sound trial strategy.

*2. Prosecutor's Comments on Morrow's Testimony*

Morrow also contends that his trial counsel failed to object to eleven different comments made by the prosecutor during the

8

course of his testimony.[2]  Morrow further complains that although

his attorney did successfully object to a twelfth comment,[3] they

did not ask that the jury be instructed to disregard it.

According to Morrow, these twelve comments were argumentative and

prejudicial; had his attorneys both objected to and asked for

limiting instructions regarding the comments, the jury might have

believed his exculpatory testimony.  The state habeas court

disagreed.  It found that Morrow's attorneys chose not to make

these objections because they believed--after considering

Morrow's "general mood, mannerisms, tone of voice, and overall

body language"--that Morrow was responding well to the cross

---

[2]    The prosecutor's comments included the following references to alleged discrepancies between Morrow's testimony on direct examination and his earlier statements to the police: (1) "[W]e have already run into one" discrepancy; (2) "and now you have added somebody else [to the list of people you saw at the crack house that night]"; (3) "Now, did you lie to the Texas Ranger or are you lying to this jury?"; and (4) "This jury needs to hear the truth."  Other comments are alleged to be either sarcastic or argumentative, including: (5) "You remember some of the details pretty well" (after Morrow claimed to have forgotten a detail of his alibi); (6) "So Chief Tidwell just got up there and he told a bald faced lie, is that what you are saying?"; (7) "But [Chief Tidwell] is lying again is that right? . . . So he is lying again, right?"; (8) "Do you really expect [the jury] to believe that?"; (9) "I guess you had a sudden flash of memory"; (10) "Two weeks and a month"--Morrow's two guesses as to how long he had been collecting unemployment benefits--"is quite a bit of difference"; and (11) regarding the murder weapon, "thank God [Allison's father] didn't know why I was asking it, but you heard him say that when he had [the ratchet] it wasn't bent."

[3]    In response to Morrow's remark that he did not believe he had made a statement that the prosecutor claimed he had made, the prosecutor replied: "Well, we are making a tape for the jury so they can figure out if they didn't hear it."

examination and, therefore, was gaining "some points" with the jury. Additionally, the state court found that Morrow's counsel believed the objections might have either flustered Morrow or interrupted his train of thought. Again, because Morrow provided no evidence to rebut these factual findings, the district court presumed that they were correct and held that defense counsel's strategic choice not to object to these comments was objectively reasonable.

We do not believe that reasonable jurists would find this conclusion debatable. "[C]ounsel's failure to object to improper remarks by a prosecutor is not ineffective assistance unless the remarks are so prejudicial as to render the trial fundamentally unfair." Jones v. Estelle, 632 F.2d 490, 492-93 (5th Cir. 1980); see also Neill v. Gibson, 278 F.3d 1044, 1058 (10th Cir. 2001) (holding that, if an ineffective-assistance claim based on not objecting to a prosecutorial comment "does not implicate any specific constitutional right, [the petitioner] will be entitled to habeas relief only if the prosecutor's improper remark resulted in a fundamentally unfair proceeding"). As we explain below, however, extensive evidence of Morrow's guilt was presented at trial, belying Morrow's conclusory argument that his counsel's inaction somehow prejudiced his defense. Thus, because Morrow has not demonstrated a reasonable probability that these comments either rendered his trial fundamentally unfair or affected the outcome of the proceeding, we decline to grant a COA

10

on this issue.  See Hubbard v. Haley, 317 F.3d 1245, 1261 (11th Cir. 2003) (denying federal habeas relief because defense counsel's decision "not to 'jump up and down' with objections . . . thereby 'annoying' the jury" was an objectively reasonable strategy).

### 3. Cumulative Questioning

Morrow's next set of contentions involves his counsel's failure to object to the prosecutor's repetitive questioning of Morrow regarding six subjects during his cross examination.[4]  He further complains that his counsel did not object, during the cross examination, to the prosecutor's repeated playing of portions of a tape-recorded conversation between Morrow and local law enforcement.  The state habeas court found that Morrow's attorneys did not lodge these objections because they did not want to interrupt Morrow's positive mood during the cross examination, did not want the jury to believe that they were hiding damaging testimony, and did not believe that the objections would be sustained.  Thus, the state court held that

---

[4]     These questions focused on the following: (1) whether Morrow was stabbed in the leg on the night of April 3, as he told the police, or whether he was shot in the leg, as he testified at trial; (2) whether Morrow remembered the price that he paid for a twelve-pack of beer on April 3; (3) why Morrow did not seek medical treatment if he was shot in the leg; (4) whether Chief Tidwell had given false testimony regarding his interrogation of Morrow; (5) whether Morrow asked Dane Schisler to lie to the police about the events of April 3; and (6) whether Morrow asked Brad Keaton to tell the police that he saw Morrow walking home between 2:30 and 3:00 a.m., not between 12:00 and 1:00 a.m., on April 3 (the night of the murder).

11

Morrow's counsel made a strategic choice to avoid making a string of overruled objections, which the attorneys believed would be more harmful than beneficial to Morrow.

Morrow proffered no evidence to rebut these findings. The district court therefore concluded that defense counsel's choice not to make these objections was objectively reasonable. Considering that Morrow provides neither a legal basis for concluding that the prosecutor's questions were improper in the first instance[5] nor an explanation of how the repetition of admissible testimony could have affected the outcome of the proceeding, we find the district court's resolution of these claims unassailable.

### 4. Impeachment

Next, Morrow contends that his counsel should have objected to some of the prosecutor's impeachment evidence; specifically (1) Morrow's three misdemeanor convictions and (2) the tape-recorded conversation between Morrow and law enforcement. First, under Rule 609(a) of the Texas Rules of Evidence, Morrow explains, a defendant who testifies as a witness may only be impeached by evidence of a prior conviction if the conviction was for a felony or a crime involving moral turpitude. See Theus v. State, 845 S.W.2d 874, 877 n.1 (Tex. Crim. App. 1992) (en banc);

---

[5] Morrow does explicitly claim that his tape-recorded statement was inadmissible; however, as we explain in the next section, he does not proffer a legal basis for this contention.

12

id. at 879 (requiring also that the probative value of the conviction outweigh its prejudicial effect).  But, in addition to impeaching Morrow with his prior felony convictions during the cross examination, Morrow notes that the prosecutor also inquired about his marijuana possession, D.W.I., and failure to identify a fugitive from justice convictions--all three of which, he claims, were misdemeanors.  Morrow complains that his counsel lodged an objection only after the third crime was mentioned.  Notably, the trial court overruled this objection, finding that Morrow had opened the door to admission of his prior misdemeanor and felony convictions by his direct examination testimony.

The state habeas court held that defense counsel's decision not to object to the use of Morrow's marijuana and D.W.I. offenses as impeachment evidence was objectively reasonable.[6] The state court found that Morrow's attorneys thought the objections would have been overruled and would also have been futile because the jury had already heard about Morrow's numerous felony convictions in three different states.  Further, the state court found that defense counsel felt that Morrow's own testimony that he was high on crack cocaine on the night of the murder

---

[6]     Of course, because his counsel objected under Rule 609(a), albeit unsuccessfully, to the prosecutor's discussion of Morrow's failure-to-identify conviction, Morrow cannot now contend that his counsel was ineffective regarding the admission of this conviction without identifying an alternate ground on which the objection would have been sustained.  See Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990).

13

would overshadow his past misdemeanors in the eyes of the jury.

The district court deferred to the state court's findings and held that Morrow's counsel's decisions were objectively reasonable. Morrow points to no evidence that might rebut these findings; instead, he merely makes a conclusory allegation that his counsel was obviously deficient for not objecting to these "inadmissible misdemeanor convictions." In light of the substantial impeachment evidence that had already been admitted and the fact that the trial court eventually ruled that Morrow had opened the door to the use of his misdemeanor convictions, jurists of reason would not find it debatable that Morrow has not met his burden of showing that there is a reasonable probability that he was prejudiced by the admission of his D.W.I. and marijuana possession convictions. Cf. Jones v. Estelle, 622 F.2d 124, 126 (5th Cir. 1980) (holding that, because "four [of the] convictions thoroughly impeached [the petitioner's] credibility," "any error in admitting the other convictions was rendered harmless"); Gibson v. United States, 575 F.2d 556, 559 (5th Cir. 1978) ("[I]n light of the overwhelming evidence of petitioner's guilt and the fact that at least two of the convictions used to impeach [his] testimony were valid, . . . the introduction of the [invalid] convictions constituted harmless error.).

Morrow's other complaint regarding the prosecutor's impeachment evidence involves the admission of a tape-recorded conversation between Morrow and Ranger Cook, which the prosecutor

14

used to demonstrate inconsistencies between Morrow's trial testimony and his prior statements to law enforcement.[7]  Morrow claims, without citing the record, that he testified that he was not entirely truthful in his conversation with Ranger Cook before the tape was introduced.  Based on this admission, Morrow argues that his attorney should have objected to the prosecutor's use of the tape-recorded statement during cross examination.  But Morrow provides no legal support for his contention that the tape-recorded statement was inadmissible.[8]  Morrow instead faults his counsel for "lodg[ing] no objection" to the use of the recorded statement, without identifying the grounds upon which an objection might have been granted.  Therefore, Morrow has not

---

[7]     The district court did not address the question whether Morrow's counsel should have objected to the admissibility of the tape-recorded statement in the first instance, probably because Morrow's argument against its admissibility is far from clear and completely lacks legal authority.  Nevertheless, out of an abundance of caution, we will address this issue in the context of Morrow's COA application.

[8]     In fact, under Rule 613(a) of the Texas Rules of Evidence, a witness may be impeached by a prior inconsistent statement provided that he has not already "unequivocally admitted" the inconsistencies between the prior statement and his trial testimony.  Aranda v. State, 736 S.W.2d 702, 708 (Tex. Crim. App. 1987); see also McGary v. State, 750 S.W.2d 782, 786 & n.3 (Tex. Crim. App. 1988).  Morrow has identified no part of the record in which he made such an unequivocal admission, however.  Thus, there is no basis for concluding that an objection to playing portions of the prior statement, which contradicted Morrow's testimony at trial, would have been granted by the trial court.  Thus, Morrow has not demonstrated a reasonable probability that his counsel's failure to object constituted constitutionally ineffective assistance.  See Johnson v. Cockrell, 306 F.3d 249, 255 (5th Cir. 2002).

15

made a substantial showing that he was denied a federal right.

5. *Prejudicial Questioning*

In the course of questioning Morrow about his prior felony convictions in Louisiana, the prosecutor asked Morrow whether he remembered that the New Orleans police discovered a ski mask in Morrow's car when they arrested him for one of his prior crimes. Morrow contends that his attorneys should have objected to the prosecutor's questions about the ski mask, because he believes that the fact that he previously owned a ski mask was irrelevant, prejudicial, and introduced in an attempt to present improper "'propensity' or 'conformity' evidence."[9]  After reviewing the record and an affidavit from Morrow's trial counsel, the state habeas court found that Morrow's attorneys did not object to the ski mask questions because, at that point in the cross examination, Morrow's body language was good and they were pleased by the content of his answers to the prosecutor's inquiries.  The district court presumed that these findings were correct and also noted that there was nothing in the record indicating that Morrow was either upset or surprised by the prosecutor's questions.  Instead, Morrow calmly explained that he probably had the ski mask in the car because he frequently used them when he worked "on drilling rigs where it's real cold

---

[9]     Morrow's brief is silent as to what conduct the prosecutor meant to imply he had a propensity for when he mentioned Morrow's ownership of a ski mask.

16

upstairs." The district court then held that defense counsel's failure to object to these questions was not objectively unreasonable. In light of these findings, which Morrow makes no attempt to rebut, we conclude that he has not made a substantial showing that his counsel was deficient in not challenging the questions and allowing Morrow to answer.

### 6. *Prosecutor's Personal Beliefs and Opinions*

Morrow further asserts that his attorneys were deficient in not objecting to the prosecutor's interjection of his personal beliefs and opinions while cross examining Morrow. Morrow highlights three comments, claiming that they were improperly argumentative and, in making them, that the prosecutor was improperly acting as a witness. With respect to the first remark, the state habeas court found that Morrow's counsel believed that there was no grounds for objection because the comment--"I am sure you have reasons for all of your lies, haven't you?"--immediately followed Morrow's testimony that he "had a reason to lie" to law enforcement before trial. Thus, the state court found no suggestion that the remark was based on evidence outside of the record. Agreeing, the district court held that defense counsel's decision not to object was objectively reasonable. Because Morrow still asserts only that the prosecutor was improperly "acting as a witness" in making this statement, without explaining how the state habeas court's

findings were clearly erroneous, we believe that reasonable jurists would agree that Morrow's counsel was not deficient in not challenging the prosecutor's question.

The other complained-of cross-examination comments include the prosecutor's assertions, "you took [Allison] down here"[10] and "I have shown where you have lied and lied and lied and lied about this incident, isn't that true?" The state habeas court found that Morrow's attorneys chose not to object to these statements because Morrow remained calm in the face of the prosecutor's questions, Morrow's responses were both logical and believable, and constantly objecting to the prosecutor's questions and comments would have alienated the members of the jury, risking the possibility that the jury would not credit Morrow's testimony. Because Morrow did not demonstrate that these factual findings were clearly erroneous, the district court assumed they were true and concluded that defense counsel's performance was objectively reasonable.

In the district court and in his COA application, Morrow has cited Hall v. United States, 419 F.2d 582, 583-84 (5th Cir. 1969), for the proposition that a prosecutor may not discuss his personal opinions during a trial because "[t]he power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says." Although Morrow

---

[10] The prosecutor was referring to the scene of the murder.

18

points us to no Texas authority, we note that a similar rule applies in Texas state courts.  See Wolfe v. State, 917 S.W.2d 270, 281 (Tex. Crim. App. 1996) (en banc) (explaining that a prosecutor may not state his personal opinions, which are not based on evidence in the record, at trial).  Be that as it may, Morrow proffers no evidence demonstrating that reasonable jurists would disagree with the district court's conclusion, under the circumstances, that it was objectively reasonable for Morrow's counsel to make the strategic choice not to object to these comments for fear of interrupting Morrow's calm demeanor or alienating the jury.  Moreover, even if we assume that defense counsel's performance was deficient, we must deny Morrow's application for a COA because, considering the context of the comments[11] and the substantial evidence of his guilt adduced at trial, he has not shown that he was prejudiced by these comments.

    7. *Prosecutor's Comment on Morrow's Right to Remain Silent*

---

[11]    First, the prosecutor's statement that Morrow "took [Allison] down" to the murder scene arose as part of a series of questions regarding whether Morrow had committed various aspects of the crime.  In response, Morrow strongly denied the allegation, just as he had denied each of the prosecutor's other allegations, which were more properly phrased as questions.  The second comment--that Morrow had "lied and lied and lied and lied" about the events of April 3--could not plausibly be interpreted as anything other than a reference to Morrow's repeated admissions, during the cross examination, that there were numerous discrepancies between his testimony on direct and the stories that he told the police, his friends, and a newspaper reporter prior to trial.  Despite these circumstances, Morrow provides no concrete argument explaining how the comments might possibly have affected the outcome of the proceeding.

19

In his final individual claim of error, Morrow asserts that his trial counsel was constitutionally ineffective for failing to object when the prosecutor commented on Morrow's exercise of his right to remain silent after being arrested for Allison's murder. At trial, Morrow testified that John Hampton murdered Allison and told Morrow about the crime on three different occasions. Because Morrow admitted that Hampton's three alleged confessions took place before Morrow voluntarily spoke with Ranger Cook, the prosecutor asked Morrow whether he had informed Ranger Cook of Hampton's guilt:

> Q: When you talked to Jeff Cook on August 12, 1996, you were already in jail, weren't you, you were already under arrest for capital murder, weren't you?
>
> A: Yes, Sir.
>
> Q: And you still didn't tell anybody, at least you didn't tell Jeff Cook that John Hampton had done this, did you?
>
> A: No, sir. I was advised not to.

According to Morrow, these questions were objectionable because they violated the rule laid down by the Supreme Court in Doyle v. Ohio, 426 U.S. 610 (1976). In Doyle, the Court ruled that the Due Process Clause of the Fourteenth Amendment prohibits a state prosecutor from impeaching a defendant's exculpatory trial testimony by reference to his post-arrest, post-Miranda-warnings silence. Id. at 618-19. Importantly, the Court reasoned that because the Miranda warnings inform a defendant of his right to remain silent, they implicitly assure him that his

20

silence will not later be used against him at trial.  Id. at 618.

Yet four years later, in Anderson v. Charles, 447 U.S. 404

(1980), the Court clarified that a prosecutor may inquire about

the inconsistencies between a defendant's testimony at trial and

his post-arrest statements to the police without violating due

process:

> Doyle does not apply to cross-examination that merely
> inquires into prior inconsistent statements.  Such
> questioning makes no unfair use of silence, because a
> defendant who voluntarily speaks after receiving Miranda
> warnings has not been induced to remain silent.  As to
> the subject matter of his statements, the defendant has
> not remained silent at all.

Id. at 408 (emphasis added).  Thus, the Court held that a

prosecutor may cross-examine a defendant regarding omissions in

his post-arrest statements when "[t]he questions [are] not

designed to draw meaning from silence, but to elicit an

explanation for a prior inconsistent statement."  Id. at 409.

Citing Charles, the state habeas court held that the

prosecutor's questions did not violate Morrow's due process

rights.  Importantly, the state court found that, although Morrow

received Miranda warnings after requesting an interview with

Ranger Cook, he waived those warnings and chose not to exercise

his right to silence when he spoke to Cook about his activities

on the night of the murder.  The district court agreed that the

prosecutor's questions fell within the exception to Doyle carved

out by Charles, after noting that the prosecutor's questions were

aimed at highlighting the discrepancy between Morrow's trial

21

testimony--that Hampton told Morrow he had committed the murder--and Morrow's arguably inconsistent statements to Ranger Cook on the same subject--that Morrow did not believe Hampton was capable of committing the murder.[12]  Thus, the district court concluded that defense counsel's decision not to object to the prosecutor's questions was objectively reasonable.

Under the standard of review laid out in AEDPA, we do not believe that Morrow has made a substantial showing that his constitutional right to the effective assistance of counsel was violated when his attorneys did not object to the prosecutor's questions.  See § 2253(c)(2).  As we stated above, a federal court may not grant habeas relief to a petitioner without first determining that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  § 2254(d)(1).  But, as the district court aptly explained, the state court's resolution of this issue was neither contrary to nor an unreasonable application of Doyle and Charles because Morrow's prior statements to Ranger Cook involved the same subject matter as, and were arguably inconsistent with, his exculpatory statements at trial that he had known for months that Hampton was

---

    [12]    During the cross-examination, the prosecutor played a tape-recorded portion of Morrow's post-arrest conversation with Ranger Cook.  After listening to his prior statements, Morrow admitted that he had told Ranger Cook, in reference to Allison's murder, that "I don't even think John Hampton is capable of doing that."

guilty of the murder.  See Pitts v. Anderson, 122 F.3d 275, 280 (5th Cir. 1997) (concluding that, under Charles, "where a prosecutor's questions and comments are aimed at eliciting an explanation for an arguably prior inconsistent statement, no Doyle violation occurs").[13]  Thus, we hold that there is no basis for granting Morrow's application for a COA on this issue.

### 8. *Strickland Prejudice*

Even if we assume that reasonable jurists might debate whether Morrow's attorneys were deficient in not making one or more of the objections enumerated in his petition for habeas relief, Morrow's claim that his attorneys were constitutionally ineffective ultimately fails because he does not (nor can he) "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  We agree with the district court's astute conclusion that, in light of the substantial evidence of Morrow's guilt adduced at trial, "defense counsel's conduct during cross-examination[] had no bearing on the outcome of the trial."

---

[13]   We note that the prosecutor posed his questions regarding Morrow's failure to inform Ranger Cook of Hampton's confessions before he confronted Morrow with the discrepancies in his prior inconsistent statement.  Because a review of the entire colloquy demonstrates that this set of questions was posed in an attempt "to elicit an explanation" for the discrepancies, and was not simply "designed to draw meaning from silence," the questions' sequence is immaterial to our analysis.  Charles, 447 U.S. at 409.

23

As both the state habeas court and the district court observed, trial testimony placed a man matching Morrow's physical and clothing description at the carwash when Allison was abducted.  Additionally, the forensic evidence revealed that Morrow's blood was in the victim's car and, at least in one stain, was mixed with the victim's blood.  Cecil Smith further revealed that Morrow had previously bragged that it would be easy to commit a crime strikingly similar to Allison's abduction at the same carwash.

Moreover, Morrow's direct examination testimony regarding his activities on the night of the murder was impeached by evidence both of Morrow's prior felony convictions and his prior inconsistent statements.  Morrow's story was also contradicted by several witnesses at trial.  For example, Dale Schisler did not agree that he dropped Morrow off at the carwash <u>after</u> Allison left the carwash; instead, he placed Morrow at the carwash at the same time that McNeil witnessed Allison's abduction.  In addition, testimony from Charlotte Miller, John Hampton, and Gary Ellison directly conflicted with Morrow's version of his activities on the night of the murder--that he spent part of the evening at Miller's house and later rode around looking for crack cocaine with Miller, Hampton, and a third man, in what turned out to be Allison's car, before returning home in the early hours of the morning.  Lastly, Hampton, whom Morrow claimed had confessed to killing Allison, denied making those statements and testified

24

instead that he was at home with his wife on the night of the murder. In sum, this evidence sufficiently demonstrates that there is no reasonable probability that the verdict would have been different had his counsel made the objections outlined above during the prosecutor's cross-examination of Morrow.[14]

## IV. CONCLUSION

For the foregoing reasons, we DENY Morrow's application for a COA.

---

[14] At the end of his COA application, Morrow argues that his counsel's constitutional ineffectiveness is clear "when one considers the totality of defense counsel's performance during the cross-examination." Although inchoate, it is plausible to infer from this statement that Morrow is attempting to present a claim of cumulative error. Nevertheless, because we have concluded that each of Morrow's individual claims of ineffective assistance lacks constitutional merit, there is nothing to cumulate and we deny Morrow's application for a COA on this ground. See Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000); see also Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised.").