BARKETT, Circuit Judge,
concurring in part, dissenting in part:
I concur with the majority opinion’s disposition of Wood’s claims based on Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). I must respectfully dissent, however, from the majority’s holding that Wood is not entitled to habeas relief on his claim of ineffective assistance during the penalty phase of his trial, because I believe that conclusion ignores specific and direct evidence of ineffectiveness of counsel in favor of nothing but pure speculation that the failure to investigate and present mitigating evidence was a “strategic decision.”
No evidence of Wood’s mental retardation was ever presented to the jury. In *1315 considering the death penalty, the jury never had the opportunity to weigh his actions in light of his undisputed diminished mental capacity. The majority claims that the record supports the state court’s finding that Wood’s counsel decided against pursuing or presenting evidence of Wood’s mental impairments. The record “evidence” upon which the majority relies, however, consists of the vague and speculative references of one attorney, Dozier, that he was “sure” the trial team “would have” adequately prepared for the penalty phase, despite his own testimony that he could not recall doing anything specific given the passage of time.[1] On the other hand, the majority altogether disregards direct and specific evidence to the contrary.
A fair reading of the entire record compels the conclusion that Wood’s lawyers, in fact, did not adequately prepare for the penalty phase and their direct testimony concedes as much. Wood’s counsel were aware that Wood suffered from mental impairments from the very beginning of their trial preparation. Despite their knowledge, counsel did not look into, follow up on, or further pursue this critical source of potentially mitigating evidence. The egregious failures of Wood’s defense counsel to investigate and develop available mitigating evidence for the penalty phase of Wood’s capital case, as delineated below, epitomizes the sort of deficient performance that an ineffective assistance claim exists to guard against. Thus, I must dissent.

I. Counsel must make an informed decision regarding the investigation and presentation of mitigating evidence

To succeed on a claim of ineffective assistance of counsel, a petitioner “must show that counsel’s representation fell below an objective standard of reasonableness” and must demonstrate that “any deficiencies in counsel’s performance [were] prejudicial .... ” Strickland, 466 U.S. 668, 688, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That is, a petitioner must demonstrate that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052.
With reference specifically to a lawyer’s duty to investigate, the Supreme Court held in Strickland that:
[CJounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel’s judgments.
Id. at 691. The Supreme Court has made clear that the obligation to present specific mitigating evidence is separate and distinct from a lawyer’s obligation to adequately investigate the background of the defendant in order to make an informed judgment about whether certain evidence should be presented. See Wig *1316 gins v. Smith, 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (“[O]ur principal concern in deciding whether [Wiggins’ lawyers] exercised ‘reasonable professional judgmen[t]’ is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel’s decision not to introduce mitigating evidence of Wiggins’ background was itself reasonable.” (emphasis in original) (citation omitted)).
This circuit has repeatedly held that “in preparing for a death penalty case, ‘a[n] attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant’s background, for possible mitigating evidence,’” Dobbs v. Turpin, 142 F.3d 1383, 1387 (11th Cir.1998) (quoting Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.1994)) (brackets in original), and that “[t]he failure to do so may render counsel’s assistance ineffective.” Id. (quoting Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir.1995)). We have also “rejected] the notion that a ‘strategic’ decision can be reasonable when the attorney has failed to investigate his options and [to] make a reasonable choice between them.” Dobbs, 142 F.3d at 1388 (quoting Baxter, 45 F.3d at 1514; citing Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991)). Simply put, “strategic decisions ... ‘must flow from an informed decision.’ ” Dobbs, 142 F.3d at 1388 (quoting Harris v. Dugger, 874 F.2d 756, 763 (11th Cir.1989)). No such strategic decisions could possibly have been made in this case because counsel had failed to adequately investigate the available mitigating evidence.

II. The record reflects totally inadequate penalty phase

preparation

A careful review of the record clearly demonstrates the appalling lack of preparation that went into the penalty phase of Wood’s trial. Cary Dozier, Frank Ralph and Ken Trotter were court-appointed attorneys representing Wood. At the time, Trotter had been practicing law for only about five months.[2] Ralph testified that Trotter “was very inexperienced. He was very nervous about this whole case. And it was quite evident just talking with him how troubled he was by it.”
Despite Trotter’s lack of experience, it is undisputed by the direct evidence in the record that he was given primary responsibility for the penalty phase of Wood’s trial by the two more experienced attorneys.[3] *1317 Ralph testified that though it was “not entirely correct” that he and Dozier had “no involvement in the preparation for or investigation of the penalty phase,” he added simply, “I remember that we met and talked about it.” Other than this vague reference to having “talked about” the penalty phase, Ralph’s overwhelming testimony is that Trotter alone handled the penalty phase of Wood’s trial, and that Ralph had nothing to do with it. Ralph was clear that counsel “decided Ken Trotter would handle [the penalty phase] ... that that was going to be his responsibility.” According to Ralph, “Ken Trotter ... handl[ed] the entire matter.”
Similarly, although Dozier claimed that all three lawyers “participated” in the various aspects of Wood’s case, he could not specify any particular matter that he handled with respect to the penalty phase. Moreover, Dozier’s statements pertaining to any “participation” by all three lawyers appear to be primarily directed to the guilt phase, and not the penalty phase. Dozier testified that “[Trotter] did basically most of the motions ... [Dozier] and Frank [Ralph] and Trotter put them all together, and we basically let Trotter handle the sentencing part of it.” The record reflects, however, that there were no written motions filed during the penalty phase of the trial.[4] Dozier did not recall whether he handled any of the witnesses for the penalty phase or whether he read Dr. Kirkland’s report before trial or met with Dr. Kirkland, but he was “sure Frank [Ralph] or Trotter or some of us did.” Dozier could not remember counsel’s penalty phase strategy, noting that the “[o]nly thing [he] remember[ed] was something about [Wood’s] childhood, and [he did not] recall what it was all about.” Moreover, Dozier did not recall even having considered introducing evidence at the penalty phase based on Dr. Kirkland’s findings. Dozier reiterated that it was “Trotter [who] handled the aggravating circumstances as far as the sentencing process went [and that] [b]asieally [he (Dozier)] and Mr. Ralph were basically the trial lawyers.” Dozier again stated that he and Ralph “basically designated Trotter to do the sentencing aspect of it.”
Trotter likewise specifically verified that he had been in charge of the penalty phase.[5] According to Trotter’s testimony at the Rule 32 hearing, originally Dozier was supposed to be the principal attorney who was to “oversee all phases of the trial, including both the penalty ... and the guilt or innocence adjudication,” but Dozier ultimately focused on the guilt/innocence phase, and, at the last minute, turned over to Trotter all of the responsibility for preparing and presenting the penalty phase. It was Trotter’s understanding “that Mr. Ralph was going to conduct the penalty phase,” however, “shortly before the trial ... a decision was made ... that [Trotter] would represent Mr. Wood during the penalty phase in the courtroom” instead. Trotter also testified that as the penalty phase approached, he “felt like [he] was working a lot of it independently and trying to call as much *1318 as [he] could to Mr. Ralph and Mr. Dozier to get their feedback on stuff. But to a certain extent, [he] was having to do a lot of work independently, more so than [he] thought when [he] initially accepted the appointment .... ” A couple of months before trial, Trotter expressed his frustration at the lack of supervision and guidance he was receiving in a letter to Kevin Doyle, a capital defense attorney from the Southern Poverty Law Center, stating, “I have been stressed out over this case and don’t have anyone with whom to discuss the case, including the two other attorneys.” (emphasis added). Thus, there is little indication in the record that either Ralph or Dozier offered any guidance to Trotter — a lawyer with only a few months of legal experience — on how to proceed in the penalty phase of a capital case.
Although the majority attempts to portray Dozier as “lead counsel” throughout both the guilt and penalty phase, this is merely the majority’s characterization of his role. (Maj. Op. at 1289, 1290, 1291, 1294.) None of Wood’s counsel specifically testified that Dozier was “lead counsel,” and in fact testified directly to the contrary as to the penalty phase. Trotter specifically testified that Dozier decided that Trotter was to “assist primarily with the penalty phase — preparation of the penalty phase” but that ultimately Trotter was to replace Ralph as the person “primarily responsible for the penalty phase.”
As soon as the guilt/innocence phase ended and Wood was convicted, the trial judge announced that the penalty phase would begin the following day. Trotter later testified that, at the time, he “didn’t think [they] were actually prepared to move forward with the penalty phase of the trial when [they did].”[6] Nonetheless, neither Trotter nor the other two attorneys moved for a continuance in order to afford them time to prepare adequately for the penalty phase. The next day, when the penalty phase before the jury was about to begin, Trotter, for the first time, asked the trial court for a psychological evaluation of Wood.
Although Dr. Kirkland had prepared a psychological report four months earlier, primarily to assess Wood’s competency for trial, Trotter explained to the court that there had been no follow-up.[7] Dr. Kirkland had found that Wood was competent to stand trial and was able to appreciate the criminality of his acts at the time of the offense. However, his report also noted that Wood was “reading on less than a 3rd grade level,” “could not use abstraction skills much beyond the *1319 low average range of intellect,” and was “functioning, at most, in the borderline range of intellectual functioning.” Despite this information, counsel conducted no further investigation regarding Wood’s mental impairments with Dr. Kirkland or anyone else.[8]
In requesting further psychological testing of Wood immediately before sentencing, Trotter told the court what should have been obvious to any reasonable lawyer upon initially reading the report: that Dr. Kirkland “indicates that the defendant may have psychological problems that need further assessment.” Indeed, Trotter conceded that even though the report had been completed months earlier, “[n]o further investigation ha[d] been done, psychologically, of those points.” Knowing that there had been a failure to pursue available mitigating evidence, and that it was too late to present it to the jury, Trotter had to ask, at that late date, that “prior to any final sentencing by the Court ... there be further psychological evaluation done of the defendant, although that won’t be admissible to this jury, prior to the judge rendering his final verdict.”[9] The judge indicated that he would “consider that [request] after we finish today.” Remarkably, however, neither Trotter nor Ralph nor Dozier followed up with the request. The record reflects that the jury returned the verdict recommending the death penalty that same day, and that neither the judge nor defense counsel raised the issue of the psychological evaluation again.
Moreover, despite counsel’s knowledge that Wood was mentally impaired, Trotter never asked any of the family witnesses questions regarding Wood’s mental impairments when he called them to testify, nor did Trotter ever try to directly contact Wood’s former teachers. In addition, though Trotter had issued a subpoena for Wood’s school records, no records were ever produced, and, amazingly again, counsel never followed up or sought legal action to enforce the subpoena. Discovering at the last minute that no records had ever been produced, Trotter once again had to make an untimely request to the judge. Just before the jury was seated for the penalty phase, Trotter, for the first time, brought to the judge’s attention that he had not received the records to which he was entitled from the “Board of Pardons and Paroles and the various state prisons in which Mr. Wood may have been incarcerated,” as well as records from the “Department of Human Resources.” Though the request for these documents had been granted some two months earlier, it was not until the morning the penalty phase was to begin that Trotter finally brought this to the court’s attention. None of Wood’s lawyers ever saw these documents or ever considered the mitigating evidence they contained.
*1320 Had Trotter adequately investigated the references in Dr. Kirkland’s report, or followed up on the school records, or even talked to Wood’s family and teachers about his mental retardation, this important aspect of Wood’s life could have been presented to the jury. None of this, or any other, evidence of Wood’s mental impairments was ever presented to the jury. Moreover, none of this evidence could possibly have had any adverse effect on the jury’s consideration of Wood’s appropriate penalty.
Shortly before the sentencing hearing in front of the judge was to begin, Trotter wrote to his co-counsel reiterating that an independent psychological evaluation should be conducted, “even if that means asking for a postponement of the sentencing hearing [before the judge].” Notwithstanding his last-minute concerns, however, Trotter did not seek a continuance after his co-counsel expressed a belief that the judge would not likely grant one. Moreover, Trotter again failed to follow up on his request for a psychological evaluation to be, at least, presented to the judge.
In a last-ditch attempt, and having not pursued the psychological evaluation he believed to be necessary, Trotter argued to the judge at the sentencing hearing that the court should consider Dr. Kirkland’s report as evidence of Wood’s mental impairments for mitigation purposes — even though the report had been prepared primarily to evaluate Wood’s mental state at the time of the crime and his competency to stand trial. He stated: “[A]s reported in the psychological report by Dr. Kirkland, [Wood] cannot use abstraction skills much beyond the low average range of intellect, and that he is at most functioning in the borderline range of intellectual functioning ... would mitigate any aggravating circumstances in this case He presented no other evidence to support Dr. Kirkland’s statements.
Simply put, the weight of the evidence in the record demonstrates that Trotter, an inexperienced and overwhelmed attorney, was given primary responsibility for investigating and preparing for the penalty phase of Wood’s trial, and he was not given any significant assistance from the rest of the trial team. He realized too late what any reasonably prepared attorney would have known: that evidence of Wood’s mental impairments could have served as mitigating evidence and deserved investigation so that it could properly be presented before sentencing. Due to Trotter’s inexperience, and to Ralph and Dozier’s lack of participation in preparation for the penalty phase, no investigation of Wood’s mental retardation was conducted at all, and that alone is the reason it was never presented to the jury in mitigation. There can be no other reasonable reading of this record.
Counsel’s failure to investigate and present the critical evidence of Wood’s mental impairments to the jury certainly “fell short of the standards for capital defense work articulated by the American Bar Association,” Wiggins, 539 U.S. at 524, 123 S.Ct. 2527, that prevailed at the time of Wood’s trial. See generally ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases at 11.4.1(C), 8.1 (commentary) (1989) (requiring counsel to engage in sufficient “efforts to discover all reasonably available mitigating evidence,” and to “conduct a thorough investigation of the defendant’s life history and background.” (emphasis added)). Their deficient representation violated Wood’s Sixth Amendment right to *1321 counsel.[10] See Stephens v. Kemp, 846 F.2d 642, 653 (11th Cir.1988) (finding ineffective assistance where, despite being put on notice of a possible mental illness, counsel “elected to pursue his investigation into [the defendant’s] mental condition no further” and “conducted no inquiry whatsoever into the possibility of presenting evidence of [the defendant’s] mental history and condition in mitigation of punishment”). Given this record, I agree with the district court’s finding that the state court’s denial of Wood’s claim of ineffective assistance of counsel involved an unreasonable application of Strickland.

III. No informed strategic decision was ever made to exclude evidence of mental retardation

Given the totally inadequate penalty phase preparation that the record reveals, as delineated above, it is clear that Wood’s counsel’s failure to investigate or present mitigating evidence of Wood’s mental impairments resulted from their sheer ne-gleet. The majority’s attempt to characterize their failure as a strategic decision “resembles more a post hoc rationalization of counsel’s conduct than an accurate description of their deliberations prior to sentencing.” Wiggins, 539 U.S. at 526-27, 123 S.Ct. 2527. There is no basis in this record to conclude that the failure to investigate was, or could have been, a reasonable strategic decision made by Wood’s counsel.[11]
First, the majority portrays Dozier as the primary decision-maker throughout trial, including during the penalty phase preparations. The majority claims that as “lead counsel,” Dozier was responsible for deciding against presenting any mitigating evidence of Wood’s mental impairments. However, as more fully explained above, Dozier confirmed that he and Ralph “basically designated Trotter to do the sentencing aspect of [the trial].” The record is clear that Dozier was not the “lead counsel” in charge of penalty phase preparations.
*1322 Second, the record demonstrates that none of Wood’s counsel, including Dozier, made a reasonable strategic decision not to investigate or present evidence of his mental impairments. To the contrary, as also explained above, Trotter tried, to obtain and present such testimony but could not because he tried too late. Trotter entreated the trial judge to, “prior to any final sentencing by the Court[,] ... [allow] further psychological evaluation of the defendant, although that won’t be admissible to this jury, prior to the judge rendering his final verdict.” Further, Trotter specifically stressed to the judge, as mitigating evidence, Dr. Kirkland’s conclusion that Wood could not “use abstraction skills much beyond the low average range of intellect, and that he [was] at most functioning in the borderline range of intellectual functioning.” Trotter’s belated attempts to argue that Wood’s mental impairments should be considered as mitigating evidence directly contradict the finding that Wood’s counsel made a decision not to present mental impairment evidence during the penalty phase. Rather, Trotter’s efforts prove that counsel hoped to do just that.[12]
Finally, even if Wood’s counsel had decided not to pursue evidence of his mental impairments, such a decision would have been unreasonable given their absolute lack of investigation. See Dobbs, 142 F.3d at 1388 (“[We] reject[] the notion that a ‘strategic’ decision can be reasonable when the attorney has failed to investigate his options and [to] make a reasonable choice between them.”); Belmontes, 529 F.3d at 857 (“[A] decision not to present a particular defense or not to offer particular mitigating evidence is unreasonable unless counsel has explored the issue sufficiently to discover the facts that might be relevant to his making an informed decision.”). Defense counsel’s failure to investigate and/or introduce mitigating evidence of Wood’s mental impairments “resulted from inattention, not reasoned strategic judgment.” Wiggins, 539 U.S. at 526, 123 S.Ct. 2527.

IV. The failure to investigate and present mental mitigating evidence was prejudicial

I agree with the district court that Wood was prejudiced by counsel’s ineffectiveness. In assessing the prejudice caused by counsel’s ineffective assistance at the penalty phase of a capital trial, we reweigh the evidence in aggravation against the totality of available mitigating evidence, which includes both the evidence introduced at trial and the evidence introduced in the habeas proceedings. Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Wiggins, 539 U.S. at 534, 123 S.Ct. 2527.
Given the nature of the State’s evidence in aggravation of Wood’s offense, as described in the majority opinion, evidence of Wood’s mental deficiencies was essential to mitigation because it would have offered the necessary context for the jury to have properly evaluated Wood’s aberrant behavior before recommending a sentence. *1323 Indeed, Wood’s “cognitive and behavioral impairments” could have suggested to the jury that, though legally culpable, he was “less morally culpable” in terms of the death penalty, because of his “diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses.” Atkins, 536 U.S. at 320, 122 S.Ct. 2242. As in Williams, “the reality that [Wood] was borderline mentally retarded, might well have influenced the jury’s appraisal of his moral culpability.” 529 U.S. at 398, 120 S.Ct. 1495 (citations and internal quotations omitted). Indeed, evidence of mental impairments “is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.” California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Connor, J., concurring). We have also recognized that “[o]ne can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider.” Blanco v. Singletary, 943 F.2d 1477, 1503 (11th Cir.1991).[13]
However, instead of presenting such evidence, Trotter’s penalty phase case consisted of testimony from three of Wood’s family members — Wood’s father and two of his sisters — whose testimony made no mention of Wood’s mental impairments and amounted to little more than a plea for juror sympathy. At the end of the one-day penalty phase, the jury recommended the death penalty by a vote of ten to two. In the subsequent sentencing hearing, the judge found that the State had proven three aggravating circumstances and that there were no mitigating circumstances, and sentenced Wood to death by electrocution.
At the Rule 32 hearing, Trotter admitted candidly, “I would like to have done more. I wished I could have done more. And I recall that at the penalty phase the verdict was ten to two. And I felt like if I could have just done a little more that maybe it could have been nine to three and that that would have been enough. And I regret that whatever it was to require that little more wasn’t there.” Moreover, Ralph testified, “I don’t think that Trotter ... brought out enough of Wood’s background through enough witnesses of the type of upbringing that he had had .... I felt like there were more circumstances in his background that were potentially mitigating that were not explored .... ” Ralph further testified that the evidence presented at the penalty phase “seemed inadequate given the circumstances.” Despite these observations, neither Ralph nor Dozier sought to introduce any evidence in addition to what Trotter presented.
On this record, I agree with the district court that there is a reasonable probability that the outcome of Wood’s penalty phase would have been different had Wood’s lawyers rendered effective assistance of counsel. In addition to any mental health experts that Wood’s counsel might have presented, counsel could have *1324 called Wood’s teachers, who testified at the Rule 32 hearing freely and without subpoena.[14] Janet Penn would have testified, as she did at the Rule 32 hearing, that Wood was a student in her special education class for two years, that all of her students had low IQ scores, and that Wood’s IQ was in the “middle to low” range in comparison to the other students in her class. Penn would have testified also that all of the special education students, regardless of age or grade level, were placed in one room in a basement; the lighting was barely adequate; the room would flood when it rained a lot; and the students were known around school as the “moles” that “lived in a mole hole.” Hilda Maddox, another of Wood’s teachers who testified at the Rule 32 hearing, would have explained that Wood’s IQ was probably “low to mid 60s,” that Wood was “educable mentally retarded or trainable mentally retarded,” and that among the students so classified, Wood ranked in the “middle range.” The jury would have been presented with testimony that Wood — even today — can read only at the third grade level and can “not use abstraction skills much beyond the low average range of intellect.” Though this information was all readily available, Trotter failed to investigate any of it in preparation for the penalty phase or to present it to the jury.
The majority claims that Wood was not prejudiced by his counsel’s failure to call Dr. Kirkland as a witness or introduce Dr. Kirkland’s report because doing so would have opened the door to the admission of potentially damaging content in the report, namely Wood’s denial that he had been drinking on the day of the offense, a list of Wood’s prior arrests, and the details of Wood’s prior violent felony conviction. (Maj. Op. at 1305-06,1310-13.) This argument is purely speculative, and it is inap-posite because it does not address Wood’s claim that his counsel failed to even investigate his mental deficiencies once those deficiencies had been discovered. The discharge of that duty could have led counsel to evidence which would not have had any detrimental effect, such as the testimony of his teachers. Moreover, had counsel properly investigated, they would have been able to assess the admissibility of Dr. Kirkland’s testimony in light of the testimony of other witnesses or existing law pertaining to the admission of evidence at that time.[15] The likelihood that counsel could have put on the mitigating evidence *1325 without introducing the damaging aspects of Dr. Kirkland’s potential testimony undermines the validity of any decision not to even investigate the critical portions of his report on this basis.
The majority opinion also suggests that because Wood was in special education and mentally impaired, the jury would have been less likely to believe that he dropped out of school to support his family. (Maj. Op. at 1306, 1312-13.) Assuming that a jury would have used evidence of Wood’s mental impairments against him directly contravenes the Supreme Court and Eleventh Circuit cases that have consistently held that diminished mental capacity may suggest to a jury that a defendant is in fact “less morally culpable,” and that evidence of even mild retardation is mitigating evidence that should be investigated and presented to the jury. See Atkins, 536 U.S. at 306-07, 317-18, 122 S.Ct. 2242; Cunningham v. Zant, 928 F.2d 1006, 1017-19 (11th Cir.1991).
The trial court in Wood’s case found that there were no mitigating factors to balance against the aggravating factors. In a case such as this, where evidence of Wood’s mental impairments could have mitigated his sentence, counsel’s failure to present it was a fatal “breakdown in the adversarial process,” Collier v Turpin, 177 F.3d 1184, 1204 (11th Cir.1999), which must undermine our confidence in the application of the death penalty in this case. Although the nature of the crime was serious, it was not so heinous as to foreclose the possibility that a reasonable jury might have returned a different sentence had they been presented with the substantial mitigating evidence of Wood’s mental status, which is discussed above. See, e.g., Rompilla v. Beard, 545 U.S. 374, 393, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (finding prejudice where defense counsel failed to present mitigating evidence of the defendant’s abusive childhood and mental health issues in case where the defendant repeatedly stabbed the victim and set him on fire). Any other suggestion not only im-permissibly abrogates the critical role of defense counsel by relieving them altogether of any responsibility to present mitigating evidence, but it also usurps the role of the jury by condemning to death all those charged with particular crimes, regardless of their individual circumstances, in direct contravention of both Supreme Court and Eleventh Circuit precedent. See, e.g., Kansas v. Marsh, 548 U.S. 163, 175, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006) (“[O]ur precedents ... oblige senteneers to consider [mitigating evidence] in determining the appropriate sentence.” (emphasis added)); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991) (“Mitigating evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty.” (emphasis added)).
Finally, I note that even in the absence of any mitigating evidence of mental impairments, the jury vote recommending the death penalty was ten to two, which is the minimum required to recommend a sentence of death under Alabama law. See Ala.Code § 13A-5-46(f).[16] Thus, in light *1326 of the compelling available mitigating evidence in this case, coupled with the narrow margin by which the jury rendered its recommendation of death, “there is a reasonable probability that the result of the proceeding would have been different,” Brownlee, 306 F.3d at 1069 (internal quotations and citations omitted), had counsel performed effectively.

V. Conclusion

In sum, I agree with the district court that there was clear evidence available that Wood “suffers some of the same limitations of reasoning, understanding, and impulse control as those described by the Supreme Court in Atkins. [Thus, counsel's failure to investigate this issue at all or to present any of this evidence seriously undermines our confidence in the application of the death sentence.” Brownlee, 306 F.3d at 1073. As in Wiggins, Wood was undoubtedly prejudiced by Trotter’s “halfhearted mitigation case.” 539 U.S. at 526, 123 S.Ct. 2527. For the foregoing reasons, I agree with the district court’s finding that the state court’s application of Strickland to the facts of this case involved an unreasonable application of clearly established federal law.

. (See Maj. Op. at 1289.) (discussing Dozier’s testimony that he was “sure” that the “trial team” interviewed potential witnesses); (Id. at 1291, 1300.) (reprinting Dozier's testimony that "we [the trial team] would have” presented useful information from Dr. Kirkland’s report and that though he could not recall if he personally read it, he was “sure we [the trial team] did”); (Id. at 1304.) (paraphrasing Dozier's testimony that if the trial team had identified helpful information in Dr. Kirkland's report, he was “sure” they “would have” used it) (emphasis added throughout).

. Although Alabama law required attorneys appointed in capital cases to have at least five years of experience in criminal law, only Ralph and Dozier had the requisite experience. See Ala.Code § 13A-5-54 (1994) ("Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law.”). While I do not address — as the issue was not raised— whether designating an entire portion of the trial to an attorney who lacks the requisite five years of experience comports with the requirements of Alabama Code § 13A-5-54, the statute highlights the legitimate concerns that accompany the appointment of an inexperienced attorney as counsel in a capital case.

. In footnote 11 of its opinion, the majority claims that Dozier and Ralph were both present and active in the penalty phase. But merely being present and active — by raising an occasional objection during the proceedings — is insufficient to demonstrate that Dozier and Ralph adequately supervised or assisted Trotter. Moreover, the assertion does not address counsel's collective failure to adequately investigate Wood's mental health status and background or to otherwise prepare for the penalty phase.

. Trotter prepared written motions only for the guilt/innocence phase of trial. Indeed, according to Ralph: “It seems like prior to the actual trial preparation we had a series of motions that I think Mr. Trotter prepared. We had a hearing on that. We all participated in that.”

. In footnote 11 of its opinion, the majority mistakenly suggests that Trotter's testimony conclusively demonstrates that he was given sufficient assistance or supervision; however, excerpts from the record — which follow the accompanying text above — show otherwise.

. The majority argues that while Trotter did not initially think that they were prepared to proceed with the penalty phase, he consulted with Ralph and Dozier, and their concerns were alleviated. (Maj. Op. at 1292.) While Ralph and Dozier’s concerns may have been alleviated, Trotter never testified that he was comfortable proceeding. Further, the majority’s contention that Dozier made the decision that no further evaluation was needed based on Dr. Kirkland’s report is directly undercut by Trotter’s request for additional psychological evaluation prior to sentencing. If Dozier did make such a decision, it then only follows that Trotter must have been extremely uncomfortable with the decision, in order to disregard it in making the request.

. The majority claims that this psychological evaluation was sufficient to investigate any mitigating evidence based on Wood's mental health. However, "[ojbtaining competency evaluations from mental health experts for guilt phase purposes does not discharge counsel's duty to consult such experts for the penalty phase because the considerations involved are very different in the two phases.” Belmontes v. Ayers, 529 F.3d 834, 859 (9th Cir.2008).

. Contrary to the majority’s characterization in footnote 9, my position does not rely on a belief that Wood's counsel were completely ignorant of his mental status. Instead, it focuses on the failure of Wood's counsel to further investigate and develop mitigating evidence having seen Dr. Kirkland’s report that made reference to Wood’s "borderline range of intellectual functioning.”

. Even had Trotter acquired and presented this evidence to the judge, his failure to investigate and present this evidence to the jury would have still rendered him ineffective for the penalty phase. We have held that the “jury is too important, and the right to introduce all mitigating evidence is too essential, to permit a judge to correct so egregious a failure by counsel to investigate, obtain, or present powerful mitigating evidence to the sentencing jury.” Brownlee v. Haley, 306 F.3d 1043, 1079 (11th Cir.2002).

. The majority opinion finds our decision in Hubbard v. Haley, 317 F.3d 1245 (11th Cir. 2003), to be particularly instructive as to "why it was not deficient performance for counsel not to present evidence of Wood’s low IQ.” (Maj. Op. at 1306-07.) That case is completely inapplicable. The performance of Hubbard’s counsel is distinguishable from the performance of counsel here because Hubbard’s defense strategy, even at sentencing, was to maintain that he was actually innocent of the crime. Hubbard, 317 F.3d at 1260. Here, defense counsel's strategy during sentencing was to put on some evidence of mitigation; counsel simply failed to sufficiently investigate the sources that may have provided them with evidence of Wood’s mental impairments. Moreover, Hubbard was unable to identify any witnesses who may have been able to testify on his behalf at sentencing. Id. Wood, on the other hand, was able to identify both teachers and family members who would have been able to testify as to his mental impairments. Finally, Hubbard’s attorneys still managed to argue mitigation evidence to the jury based on what was in the Bryce Hospital records. Id. at 1260 n. 25. Wood’s jury never even knew a psychological evaluation existed.

. The majority cites to Trotter’s testimony that Dozier reviewed Dr. Kirkland's report and that Dozier determined that no further evaluators were necessary. (Maj. Op. at 1290-91, 1294, 1308.) Even if it were true that Dozier decided that it was unnecessary to further investigate Wood’s mental health, such a decision would have been inherently unreasonable because Dozier failed to adequately investigate Wood's mental retardation before making that determination, especially in light of Trotter's repeated concerns regarding his readings that psychological evaluations were a source of mitigating evidence in death penalty cases. See Dobbs, 142 F.3d at 1388.

. While state court findings that are supported by the record are due deference under AEDPA, we may not defer to them where there is clear and convincing evidence which indicates that the state court’s findings amount to “an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.” 28 U.S.C. § 2254(d)(2). An unwillingness to turn a blind eye to evidence in this case that demonstrates the state court’s findings were unreasonable is not the same as conducting a de novo review.

. In footnote 32, the majority suggests that I fail to recognize that the state court found that Wood is not mentally retarded. This is incorrect. Rather, I recognize that Wood was found to not be mentally retarded for the purposes of Atkins. The majority apparently labors under the misapprehension that the state court’s finding that Wood is not mentally retarded for the purposes of Atkins means that evidence of Wood's mental impairments, which were not disputed by anyone, could not have served as mitigating evidence.

. Wood's teachers confirmed at the Rule 32 hearing that had they been contacted, they would have agreed to speak with Wood's counsel and to testify regarding Wood’s mental retardation and the conditions at Wood's school.

. Specifically, evidence of Wood's past felony may have been viewed as cumulative evidence since the State introduced a certified copy of Wood's prior conviction for first-degree assault and the Pardons and Parole clerk testified that Wood was on parole when he committed the murder. Alternatively, the trial court may have ruled to exclude Dr. Kirkland's testimony about Wood's past offenses on the basis that it would be unduly prejudicial, just as it did when the State attempted to call Barbara Siler, the victim in Wood’s prior felony assault conviction, to testify at sentencing.
The majority also references nineteen prior arrests between 1981 and 1984 which Dr. Kirkland mentions in his report as potentially damaging evidence. However, many of these arrests never resulted in convictions and the existing law pertaining to admission of such evidence was favorable to Wood. For example, see United States v. Eubanks, 876 F.2d 1514, 1516-17 (11th Cir.1989) (inappropriate for prosecutor to question defendant about prior arrests that did not result in convictions); United States v. Lay, 644 F.2d 1087, 1091 (5th Cir.1981) (improper for prosecutor to question defendant about prior arrest with *1325 out conviction); United States v. Labarbera, 581 F.2d 107, 108-09 (5th Cir.1978) (mere arrest without conviction for any offense inadmissible to show general lack of credibility); United States v. Hodnett, 537 F.2d 828, 829 (5th Cir.1976) (same); United States v. Garcia, 531 F.2d 1303, 1306-07 (5th Cir.1976) (same).

. Alabama Code § 13A-5-46(f) provides:
"The decision of the jury to return an advisory verdict recommending a sentence of *1326 life imprisonment without parole must be based on a vote of a majority of the jurors. The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors. The verdict of the jury must be in writing and must specify the vote.”